PEOPLE v DUNN

Docket No. 93832. Argued December 1, 1993 (Calendar No. 3). Decided August 26, 1994.

Alex F. Dunn was convicted by a jury in the Washtenaw Circuit Court, Edward D. Deake, J., of possession with intent to deliver 225 to 650 grams of cocaine. He subsequently pleaded guilty of being an habitual offender, second offense. During trial, detectives were permitted to testify regarding inculpatory statements made by the defendant during plea bargaining, and the prosecutor emphasized the statements during closing argument. In addition, the defendant appeared in the courtroom in leg irons. The Court of Appeals, REILLY, P.J., and MACKENZIE and WEAVER, JJ., affirmed in an unpublished opinion per curiam, concluding that although the defendant had a subjective expectation of negotiating a plea at the time he spoke with the detectives, his expectation was reasonable, given the totality of the objective circumstances, and, thus, admission of the statements violated MRE 410, reversal was not required because the error was harmless beyond a reasonable doubt (Docket No. 116674). The defendant appeals.

In an opinion by Justice LEVIN, joined by Chief Justice CAVANAGH, and Justices BRICKLEY and MALLETT, the Supreme Court *held:*

1. On de novo review of the whole record, admission of the testimony of the detectives concerning statements made by the defendant in connection with his offer to plead guilty to a lesser offense was error, and the error was not harmless. The defendant had a subjective expectation of negotiating a plea at the time of the discussion, and his expectation was reasonable given the totality of the objective circumstances.

2. A court may order shackling of a defendant during trial only on a finding supported by record evidence that shackling is necessary to prevent escape, injury to persons in the courtroom, or to maintain order. On retrial, the defendant is not to be shackled absent such a finding so supported.

Reversed and remanded.

Justice RILEY, joined by Justices BOYLE and GRIFFIN, dissenting, stated that the defendant's statements to law enforcement

officers were not part of a plea negotiation and should have been admitted, making remand unwarranted.

To determine whether admissions occurred during plea discussions, the trial court must determine whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of discussion, and whether the expectation was reasonable given the totality of the objective circumstances. Statements made during requests to arrange plea agreements are admissible, as are incriminatory statements offered by a defendant after forewarnings by law enforcement officials that they lacked authority to complete a plea bargain.

In this case, the officers informed the defendant of his *Miranda* rights and explained that they were incapable of guaranteeing a plea agreement because any agreement would have to be negotiated and approved by the prosecuting attorney. The defendant's purported belief that he had entered bona fide plea negotiations or that the statements made to law enforcement officials would not be used against him is unreasonable. When he agreed to provide the information, he bore the risk that a plea agreement would not be reached.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Brian L. Mackie,* Prosecuting Attorney, and *Marilyn A. Eisenbraun* and *David A. King,* Assistant Prosecuting Attorneys, for the people.

State Appellate Defender (by *Ronald E. Steinberg*) for the defendant.

LEVIN, J. Alex Ferman Dunn was convicted of possession with intent to deliver 225 to 650 grams of cocaine.[1] The Court of Appeals affirmed.[2]

A

We granted leave to appeal to consider:

---

[1] MCL 333.7401(2)(a)(ii); MSA 14.15(7401)(2)(a)(ii). He pleaded guilty of being an habitual offender, second offense, MCL 769.10; MSA 28.1082, and was sentenced to serve fifteen to forty-five years.

[2] Unpublished per curiam opinion, issued April 14, 1992 (Docket No. 116674).

- whether the admission at trial of Dunn's statements to police in connection with an attempt to negotiate a plea bargain was harmless error, and
- whether his appearance in the courtroom in leg irons deprived him of a fair trial.[3]

We reverse because we find that the admission of Dunn's statements was error, and that the error was not harmless.

B

While Dunn's legs were shackled, the record does not show that any member of the jury saw or could see the leg irons,[4] and, therefore, the record does not provide a basis for a finding that the use of leg irons deprived Dunn of a fair trial.

A court may order shackling of a defendant only on a finding supported by record evidence that shackling is necessary to prevent escape, injury to persons in the courtroom, or to maintain order.[5] Dunn shall not be shackled on retrial, absent such a finding so supported.

I

The principal factual issue was whether it was Dunn who possessed the cocaine, or it was Lori Stegall or Michael Cranston, or possibly some other person, who possessed the cocaine.

The people's evidence tended to show that Dunn appeared, at about midnight, in August 1988 at

[3] 443 Mich 852 (1993).

[4] See part v, n 26, and the accompanying text.

[5] See *People v Duplissey,* 380 Mich 100, 103; 155 NW2d 850 (1968), and authorities discussed in part v, n 26, and the accompanying text.

the door of Stegall's apartment and was admitted. Also present was her boyfriend, Cranston. Stegall expressed a desire to use cocaine. She said that Dunn offered to obtain cocaine, and returned about half an hour later carrying a garbage bag containing a large amount of cocaine. Stegall and Cranston claimed that the large quantity frightened Stegall.

A relatively small quantity, less than fifty grams,[6] was transferred from the larger quantity by Cranston, Stegall, or Dunn into a small baggie that Stegall testified she gave to Cranston. Stegall gave Dunn a brown paper bag in which to store the larger quantity of cocaine, and supplied him with a syringe, a belt, and a spoon to administer the drug.

With Dunn's assistance, Stegall injected herself with liquified cocaine. Dunn injected himself, and experienced a violent drug reaction. His eyes were bulging, he was shaking, freezing, jumping, swinging at things that were not there, and running around the house.[7]

Cranston and Stegall claimed that they left the apartment with her children and telephoned the police from a neighbor's home.[8]

When the police arrived, they were given permission to search Stegall's apartment. They seized the small baggie containing cocaine, but did not observe the larger bag of cocaine that was left, so

---

[6] Dunn was originally charged with possession of less than fifty grams.

[7] Stegall testified that he began banging on walls, swinging his arms, screaming, and running through the apartment trying to grab Stegall's throat.

Cranston testified that Dunn immediately overdosed, grunting, shaking, and swinging wildly at imaginary objects.

[8] They provided the police a bogus story about an unknown person breaking into their house and chasing them with a cocaine syringe. A second phone call was made to the police indicating that shots were heard.

Stegall or Cranston testified, in the middle of the bedroom floor. Stegall alerted the police to the bag of cocaine, whereupon they seized the bag. Fingerprints and a partial palm print on the large bag and the baggie could not be identified as belonging to Dunn, Stegall, or Cranston.

Dunn was arrested outside the apartment. A police officer testified that he was shaking, sweating, and barely able to stand. En route to the police station, Dunn said "the stuff was mine, that they didn't have anything to do with it." Dunn identified "they" as Stegall and Cranston. Dunn added that "he didn't want to get them in trouble, that they had nothing to do with it."[9] Another officer testified that he stayed with Dunn for a number of hours in the emergency room, and that Dunn spontaneously asked "where is my cocaine[?]"[10] Dunn did not, however, specify whether the "stuff " or "my cocaine" was the cocaine in the baggie or the cocaine in the larger bag or both.

II

Dunn initiated communication with the police several days after his arrest in an effort to work out a plea bargain. The police indicated that they could not talk to the prosecutor about a plea bargain until they knew "what information he had."

Dunn said that he had been hired by a drug dealer in Florida to bring cocaine into this country from South America, that he obtained the drugs, that the drug dealer was still waiting for him to deliver the cocaine, and that he was willing to

---

[9] An officer testified that Dunn made those statements both before and after his eyes rolled back in his head.

[10] Interspersed with this question were a number of incomprehensible statements in the emergency room attributable to his drug overdose, such as little green heads popping out of the ground to kill him.

help police set up a delivery in exchange for a plea
bargain that would permit him to plead guilty of
possession of under fifty grams of cocaine.

Dunn was allowed to telephone the dealer in
Florida, with police recording the telephone call.
The police then believed that there might be some
substance to what Dunn was saying,[11] and told him
they would communicate with the prosecutor.
Dunn was unable to arrange a meeting with the
Florida dealer,[12] the negotiations for a plea bargain
ended, and he was prosecuted for possession with
intent to deliver 225 to 650 grams of cocaine.

Following a pretrial hearing, the circuit court
ruled that Dunn's statements could be admitted in
evidence. The police officers testified regarding the
statements during the trial. The prosecutor em-
phasized Dunn's inculpatory statements during his
closing argument.[13]

III

The Court of Appeals held that Dunn's state-
ments were made in connection with an offer to
plead guilty, and that their admission into evi-
dence was violative of MRE 410.[14]

---

[11] An officer testified:

We then transported him back to the Ypsilanti Police station
and he did make a call, which I recorded on a tape recorder
and did speak with a subject in Florida that at least implied
that that person was the one he was suppost [sic] to deliver the
cocaine to.

[12] A warrant was obtained to record a second phone call to Florida.
Dunn placed a second call, but the alleged seller could no longer be
reached.

[13] See ns 19 and 20 and the accompanying text.

[14] When Dunn made his statements to the police, MRE 410 read as
follows:

Inadmissibility of Pleas, Offers of Pleas, and Related State-
ments.

A

The Court of Appeals relied on its decision in *People v Oliver,* 111 Mich App 734; 314 NW2d 740 (1981), which in turn relied on *United States v Robertson,* 582 F2d 1356, 1366 (CA 5, 1978), in which the United States Court of Appeals for the Fifth Circuit, construed FRE 410, on which MRE 410 is based, and said:

> The trial court must apply a two-tiered analysis and determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances.

We conclude, in agreement with the Court of Appeals,[15] that Dunn had a subjective expectation to negotiate a plea at the time of the discussion,

Except as otherwise provided in this rule, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer. However, evidence of a statement made in connection with, and relevant to, a plea of guilty, later withdrawn, a plea of nolo contendere, or an offer to plead guilty or nolo contendere to the crime charged or any other crime, is admissible in a criminal proceeding for perjury or false statement.

A note accompanying the rule states:

MRE 410 is identical with Rule 410 of the Federal Rules of Evidence and Rule 11(e)(6) of the Federal Rules of Criminal Procedure except that the concluding phrase "if the statement was made by the defendant under oath, on the record, and in the presence of counsel" is omitted from MRE 410.

MRE 410 was substantially amended effective October 1, 1991. See n 16, and the accompanying text.

[15] The Court of Appeals said:

and that his expectation was reasonable given the totality of the objective circumstances. Shortly after his arrest, Dunn initiated communication with the detectives for the express purpose of negotiating a plea bargain with the prosecutor. The detectives encouraged him to talk so they could discuss the possibility of a plea with the prosecutor. With the information supplied by Dunn, the detectives went to the prosecutor and obtained a warrant for the second phone call.

B

Effective October 1, 1991, the rule was amended to provide that evidence of a statement made during plea discussions is not admissible against a defendant who was a participant in the plea discussions if the statement was "made in the course of plea discussions *with an attorney for the prosecuting authority* which do not result in a plea of guilty or which result in a plea of guilty later withdrawn."[16] (Emphasis added.)

Dunn was convicted in 1989 before the amendment of MRE 410. The question whether the

---

Defendant obviously had a subjective expectation that a plea might be negotiated. This is evident from his statements to the police officer—particularly when defendant informed the officer immediately that he wanted to make a deal.

Since the defendant exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, the question is whether this expectation was reasonable given the totality of the objective circumstances. *Oliver, supra.* We conclude that it was. The police officer had told defendant that he could not negotiate a deal with defendant. However, the officer also told defendant he needed more information from defendant to go to the prosecutor. The officers were aware that defendant wanted a deal, and they encouraged him to talk even knowing he would not do so unless promised a deal.

[16] MRE 410 was substantially rewritten by the amendment effective October 1, 1991, and there are changes other than those adverted to in n 14. Readers are cautioned to consult a current version of the rule.

amendment should be retroactive has not been briefed or argued. We intimate no opinion respecting the admissibility at the retrial of the detectives' testimony concerning Dunn's statements during the plea discussions.

IV

We turn to consideration of whether the error in admitting in evidence the testimony of the detectives concerning statements made by Dunn in connection with his offer to plead guilty of a lesser offense was harmless. We conclude, on de novo review of the whole record, that the error in admitting in evidence the testimony of the detectives concerning statements made by Dunn in connection with his offer to plead guilty to a lesser offense was not harmless.

A

Dunn did not testify. Nothing contradicts the testimony of one of the officers that Dunn spontaneously asked, while in the emergency room, "where is my cocaine[?]" or of another officer who testified that, en route to the police station, Dunn said, in effect, that Stegall and Cranston "didn't have anything to do with [the *stuff*"] that the "stuff" was his, and that he "didn't want to get them in trouble [because] they had nothing to do with *it.*" (Emphasis supplied.)[17]

The testimony erroneously admitted, that Dunn

[17] Police officers are interested witnesses. They are engaged in, what Justice Jackson described as "the often competitive enterprise of ferreting out crime." *Johnson v United States,* 333 US 10, 14; 68 S Ct 367; 92 L Ed 436 (1948).

If the officers' testimony had been contradicted, that alone, because of their interest, might have been sufficient to preclude a finding that the error in admitting the testimony regarding the admissions made during plea bargaining was harmless.

had stated that he obtained the cocaine "from a location in Equador [sic] which is located in South America," and that he flew into Miami from out of the country back into the United States, was supposed to deliver the cocaine to someone else, but did not, portrayed Dunn as part of the South American drug trade, rather than simply as a person who might have known where in the Ypsilanti area to obtain drugs on short notice in the middle of the night. The inadmissible testimony concerning Dunn's admissions during plea bargaining thus cannot be characterized as merely cumulative of the testimony concerning his admissions at the hospital and en route to the police station.

B

Dunn's lawyer theorized and argued that Dunn went to the apartment to purchase the little baggie of cocaine found by the police, and that that was the cocaine to which he was referring when he said, "where's my cocaine[?]"[18]

Dunn's statements referring to "stuff" and "it"

---

[18] · Okay, where is my cocaine, the little bag of cocaine that Alex Dunn went there to purchase remained at the scene, and that's where his cocaine was. The big bag of cocaine, the one that Lori Stegall says is in this big paper bag in the middle of the floor, the cops couldn't miss it, nonsense. She handed it over to the cops while the officers were searching. The officers saying no, no, we didn't see it, we were, you know, Lori Stegall is running scared on this case.

She's got this bag, I don't know where it came from; I don't even want to know where it came from; but take this, get rid of it. Absolutely everything Lori Stegall said is so far from the truth that a reasonable juror probably couldn't believe even that her name is Lori Stegall.

Mike Cranston, well, only minorly more credible. Still he lied up and down to you folks. Beyond that, what other evidence is there to link Alex Dunn to these drugs? The statement of these officers that Alex said that was my dope. Well, if you believe that, then again I can see that you'll probably find him guilty of one of these offenses.

did not specify a particular quantity of cocaine. But for the erroneous admission of Dunn's confession that he had imported the cocaine from Ecuador, the jurors could have reasonably concluded, giving Dunn the benefit of a reasonable doubt—as they were required to do—that Dunn's statements in the hospital and en route to the police station, might have referred to the cocaine in the baggie rather than the larger quantity.

While Stegall and Cranston's testimony identifying Dunn as the owner of the cocaine would, if believed by the jury, be sufficient to support his conviction, the jury might very well have refused to believe their testimony standing alone. Both had an obvious self-interest in exculpating themselves from responsibility for the cocaine found in the apartment that Stegall and Cranston shared.

While Stegall and Cranston called the police, they gave bogus reasons for having done so. Dunn had overdosed on cocaine, and was going berserk in their apartment. The noise he was making, banging on the walls, and his appearance might have drawn the police to the apartment, even if Stegall and Cranston had not telephoned the police. Stegall and Cranston contradicted each other in a number of areas, conceded they had lied, and the jury might have disbelieved their testimony, attributing possession of the larger quantity and not just the cocaine in the baggie to Dunn, absent the inadmissible evidence.[19]

C

In deciding if there was a reasonable doubt

---

[19] While Stegall admitted providing Cranston with the baggie, she denied that she wanted a sample of the cocaine, and testified that she did not know why she gave the baggie to Cranston.

The palm print on the baggie did not belong to Dunn, Stegall, or Cranston. Dunn's lawyer argued to the jury that a fourth person might have been involved.

whether Dunn's statements referred to the cocaine
in the baggie or the cocaine in the larger bag, the
jury might, absent the inadmissible evidence that
he had imported the cocaine from Ecuador, have
taken into consideration that Dunn was delusional
—green heads popping out of the ground to kill
him—when he made the admissions in the hospi-
tal and en route to the police station that did not
specify, as did the confessional statement that he
had imported the cocaine from Ecuador, a particu-
lar quantity.

The prosecutor, in responding to Dunn's law-
yer's argument that Dunn went over to the Ste-
gall-Cranston apartment to buy cocaine, observed
that, in contrast with the statements in the hospi-
tal and en route to the police station, the confes-
sional statement that Dunn had imported the
cocaine from Ecuador was made "at the jail when
he wasn't talking about green heads, when he
wasn't under the affects of the drug, when he
knew full well what he was doing."[20]

Absent the inadmissible evidence that Dunn had
imported the cocaine from Ecuador, the jury might

---

[20] The prosecutor responded that it was ludicrous to suggest that
Dunn went over to buy cocaine from Stegall, and that she would have
turned over $40,000 worth of drugs to the police. But she did just
that, whether it was her cocaine, Cranston's cocaine, or Dunn's
cocaine. The prosecutor then said that her statements were supported
by Dunn's statements during the plea discussions:

> [And] by this man himself, not just in the police car, not just
> at the hospital, but at the jail when he wasn't talking about
> green heads, when he wasn't under the affects of the drug,
> when he knew full well what he was doing.
>
> He told Detective Lewis, he told Detective Sergeant Hall, the
> drugs are mine; I brought them into the country. There is no
> other reasonable conclusion. To suggest that Lori Stegall is the
> owner of the drugs is unreasonable. It doesn't make common
> sense.
>
> The only reasonable conclusion is that the drugs belonged to
> Alex Dunn, and that he intended to deliver them, and I ask you
> to return a verdict of guilty. [Emphasis added.]

have taken into consideration, in deciding whether
it was Stegall or Cranston, rather than Dunn, who
possessed the larger quantity, that the police did
not observe the larger quantity in the bag that
Stegall said was in the middle of the bedroom floor
and found it only after Stegall alerted them to
their oversight. The jury could reasonably have
concluded that if the police did not see the bag
containing the larger quantity on their first sweep
through the bedroom, Dunn may not have seen it,
and indeed only Stegall and Cranston were aware
of the larger bag, and thus that Dunn was refer-
encing the baggie rather than the larger bag of
cocaine when he spoke of "stuff" and "it" to the
police, and given Dunn the benefit of the doubt on
the central question whether he possessed as much
as 225 to 650 grams of cocaine.

D

The prosecutor, having relied on the greater
reliability of Dunn's confessional statement con-
cerning the importation of the larger quantity
from Ecuador, can hardly be heard to contend
that, absent the inadmissible evidence, the jurors
might not have concluded that there was a reason-
able doubt whether it was Dunn who possessed the
larger quantity, or whether it was Stegall or Cran-
ston—who had prevaricated in a number of areas
—who possessed the larger quantity of cocaine,
and concluded that they could only decide beyond
a reasonable doubt that Dunn possessed a smaller
quantity, the quantity in the baggie.

The prosecutor emphasized the difference be-
tween the statements made to the officers in the
hospital and en route to the police station and the
statements made during plea bargaining, stating
that "you can't get a much better admission from

the Defendant that the cocaine was his" than the statements made in the hospital and en route to the police station, "except that we do have a *better admission* that the cocaine was his" (emphasis added), and then referred to the statements made by Dunn during the plea discussions about importation of the cocaine, and that he had brought the cocaine in the suitcase to Ms. Stegall's house—statements that clearly acknowledge that it was he who possessed the larger quantity.[21]

In *Arizona v Fulminante,* 499 US 279; 111 S Ct 1246; 113 L Ed 2d 302 (1991), a majority of the United States Supreme Court, in opinions by Justices White and Kennedy, expressed the view that a full-confessional statement ordinarily is not

---

[21] The prosecutor referred to Dunn's statement to the officers acknowledging that it was his "stuff," argued that he must have been referring to "the drugs," and argued further that that was "the only thing that he brought over [to the apartment] according to the testimony of Ms. Stegall and Mr. Cranston," testimony that the jury, for reasons already alluded to, might have chosen to disbelieve. He then referred to the statement in the hospital "where's my cocaine[?]" and said:

You can't really get any more explicit than that; you can't get a much better admission from the Defendant that the cocaine was his, *except that we do have a better admission that the cocaine was his,* and that admission came to Detective Lewis and Detective Sergeant Hall.

The day after the Defendant was arrested, they went to the Washtenaw County Jail at his request to talk to him, and they advised him of his rights, and he told them at that time that the cocaine was brought into the country by him in a suitcase, and that he had brought it over to Ms. Stegall's house that day, and shared it with him.

So we have three statements from the Defendant *two of which carry the very clear implication* that the cocaine was his.

*The third one is about as explicit as you can get,* that the Defendant admitted not only that the cocaine was his, but he had actually brought it to the country from Ecuador. Clearly the Defendant knowingly and intentionally possessed the cocaine that he brought to Lori Stegall's house that day. [Emphasis added.]

harmless, and was not harmless under the circumstances:

> *A confession is like no other evidence. Indeed,* "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . .* [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. *Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." Bruton v United States,* 391 US [123, 139-140; 88 S Ct 1620; 20 L Ed 2d 476 (1968)] (White, J., dissenting). See also *Cruz v New York,* 481 US [186, 195; 107 S Ct 1714; 95 L Ed 2d 162 (1987)] (White, J., dissenting) (citing *Bruton*). *While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision.* In the case of a coerced confession such as that given by Fulminante to Sarivola, the risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise *extreme caution* before determining that the admission of the confession at trial was harmless. [Emphasis added.][22]

> [T]he court conducting a harmless-error inquiry must appreciate the indelible impact a full confession may have on the trier of fact, *as distinguished, for instance, from the impact of an isolated statement that incriminates the defendant only when connected with other evidence.* If the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, *without careful*

---

[22] *Id.,* p 296 (White, J., with Marshall, Blackmun and Stevens, JJ., concurring).

*consideration of the other evidence in the case.*
[Emphasis added.][23]

Often, as here, when the defendant confesses, there can be little doubt concerning his guilt. In light of Dunn's statements to the police officers during the plea discussions, there can be little or no doubt that he, rather than Stegall and Cranston, possessed the larger quantity of cocaine.

The jury, absent the inadmissible testimony that Dunn had imported the larger quantity from Ecuador, might have decided that Dunn should not be convicted on the basis of Stegall or Cranston's testimony because of their self-interest, conflicting stories, and admissions that they had lied, and declined to convict Dunn of possession of 225 to 650 grams with intent to deliver.[24]

V

Dunn's lawyer moved that he not be required to wear leg irons in the courtroom. The court denied the motion, indicating that because of the physical arrangement of the courtroom, the shackles should not be visible to the jury. If Dunn were to testify— he did not—the leg irons would be removed before he took the witness stand. Dunn's lawyer claimed

---

[23] *Id.,* p 313 (Kennedy, J., concurring in the judgment).

[24] Dunn was originally charged with possession of less than fifty grams. He was bound over on a charge of possession of 225 to 650 grams with intent to deliver.

The jury was instructed that he could be convicted of possession of 225 to 650 grams with intent to deliver, or simply with possession of 225 to 650 grams. The jury was not instructed on the lesser offense of possession of less than fifty grams of cocaine. While Dunn's lawyer argued (see ns 18 ff) that Dunn may have possessed the cocaine in the baggie, but not the cocaine in the larger bag, he did not inexplicably request an instruction on the lesser offense of possession of less than fifty grams of cocaine. But for that failure, the jury might have convicted him, on the basis of the police officers' testimony, uncontradicted by Dunn, of the lesser offense of possession of less than fifty grams of cocaine.

at one point that a juror saw Dunn wearing the shackles while outside the courtroom.

The record does not show, however, that any member of the jury saw or could see the leg irons, and, therefore, the record does not provide a basis for a finding that the use of leg irons deprived Dunn of a fair trial.[25]

The rule is well-established in this and other jurisdictions[26] that a defendant may be shackled only on a finding supported by record evidence that this is necessary to prevent escape, injury to persons in the courtroom or to maintain order. In *People v Duplissey,* 380 Mich 100, 103; 155 NW2d 850 (1968), this Court quoted with approval the

[25] See *State v McMurtrey,* 136 Ariz 93, 98; 664 P2d 637 (1983). *State v Scott,* 323 NW2d 790, 792 (Minn, 1982).

[26] In an oft-quoted statement, the Supreme Court of Colorado stated in *Eaddy v People,* 115 Colo 488, 492; 174 P2d 717 (1946), that "[t]he presumption of innocence requires the garb of innocence . . . ."

The Supreme Court of California said in *People v Duran,* 16 Cal 3d 282, 290-291; 127 Cal Rptr 618; 545 P2d 1322 (1976):

> We reaffirm the rule that a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.

> Restraints have been viewed historically as an extreme measure to be used only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape. [*State v Hartzog,* 96 Wash 2d 383, 398; 635 P2d 694 (1981).]

> The courts of other jurisdictions have long recognized the substantial danger of destruction in the minds of the jury of the presumption of innocence where the accused is required to wear prison garb, is handcuffed or otherwise shackled. [*Hickson v State,* 472 So 2d 379, 383 (Miss, 1985).]

Similarly, see *Anthony v State,* 521 P2d 486, 496 (Alas, 1974); *State v Thompson,* 832 SW2d 577, 580 (Tenn Crim App, 1991); *State v Billups,* 368 SE2d 723, 725 (W Va, 1988); *Woodards v Cardwell,* 430 F2d 978, 982 (CA 6, 1970); *Kennedy v Cardwell,* 487 F2d 101, 104 (CA 6, 1973); *Spain v Rushen,* 883 F2d 712, 728 (CA 9, 1989). See also *State v Allen,* 397 US 337; 90 S Ct 1057; 25 L Ed 2d 353 (1970).

following statement of the United States Court of Appeals for the Tenth Circuit:

"Freedom from shackling and manacling of a defendant during the trial of a criminal case has long been recognized as an important component of a fair and impartial trial. 14 Am Jur, Criminal Law, § 132. Ordinarily such procedure should be permitted only to prevent the escape of the prisoner or to prevent him from injuring bystanders and officers of the court or to maintain a quiet and peaceable trial." [Quoting *Odell v Hudspeth,* 189 F2d 300, 302 (CA 10, 1951).][27]

The American Bar Association Standards of Criminal Justice provide that a defendant in a criminal case should not be subjected to physical restraint while in court unless the judge, for reasons entered on the record, finds such restraint "reasonably necessary to maintain order."[28]

----

[27] This Court ordered a new trial, stating that there had been an abuse of judicial discretion in denying Duplissey's motion for a separate trial.

Duplissey and three other persons were tried on armed robbery charges. Two of the codefendants were disruptive and all the defendants were handcuffed throughout the remainder of the trial. Duplissey took no part in the disruptive conduct, and, when his lawyer moved for a separate trial, the judge said that the lawyer could point with pride to the conduct and demeanor and behavior of his client, and denied the motion for a separate trial.

[28] Custody and restraint of defendants and witnesses

(a) During trial the defendant should be seated where he or she can effectively consult with counsel and can see and hear the proceedings.

(b) The trial judge should not permit a defendant or witness to appear at trial in the distinctive attire of a prisoner, unless specifically waived by the defendant.

(c) Defendants and witnesses should not be subjected to physical restraint while in court unless the trial judge has found such restraint reasonably necessary to maintain order. If the trial judge orders such restraint, the judge should enter into the record of the case the reasons therefor. Whenever physical restraint of a defendant or witness occurs in the presence of jurors trying the case, the judge should instruct those jurors that such restraint is not to be considered in

The record contains no evidence that would support an order requiring that Dunn wear leg irons or otherwise be physically restrained after he entered the courtroom. On the retrial, he shall not be required to wear leg irons or otherwise be physically restrained in the courtroom absent a finding supported by record evidence that would justify such restraint.

Reversed and remanded for a new trial.

CAVANAGH, C.J., and BRICKLEY and MALLETT, JJ., concurred with LEVIN, J.

RILEY, J. (*dissenting*). Because I would hold that defendant's statements to law enforcement officers are not inadmissible as a part of a plea negotiation, and that a remand is unwarranted because the evidence is admissible on remand, I dissent.

I

Defendant Alex Dunn was convicted by a jury of possession with intent to deliver between 225 and 650 grams of cocaine, MCL 333.7401(2)(a)(ii); MSA 14.15(7401)(2)(a)(ii). He later pleaded guilty of being an habitual offender, second offense, MCL 769.10; MSA 28.1082. At issue is the admission of statements he made while in custody. Ypsilanti police detectives James Hall and Jeffrey Lewis met defendant after sheriff's detective Joe Hall informed them that defendant desired to reveal information in exchange for a "deal" on the pending charges. The officers testified that defendant

assessing the proof and determining guilt. [3 ABA Standards of Criminal Justice (2d ed), Standard 15-3.1, pp 15-77 to 15-78.]

was advised of, and waived, his *Miranda*[1] rights. Defendant asked that the charges be dropped to possession of fifty grams or less, and that he be guaranteed that offense without revealing any specific information. The police refused. The officers informed defendant that they were incapable of brokering any agreement because they did not possess the power to do so and that the consent of the prosecutor was necessary. Furthermore, they refused to convince the prosecutor of the benefits of a plea bargain without knowing what information he had to offer.

Nevertheless, defendant then admitted that he picked up a kilogram of cocaine in Peru or Ecuador, and planned to sell it in Florida. Because he became nervous in Florida, he flew to Georgia and then to Michigan with the cocaine. Defendant admitted that on the night of his arrest he arrived at a friend's residence, brought the cocaine, injected himself and his friend with cocaine, and overdosed.[2] Defendant suggested that he could "set-up" his contact in exchange for leniency, and even called the contact in the detectives' presence.

Lewis contacted the prosecutor who agreed to enter a plea agreement with defendant if he could tie the cocaine to the contact. Unfortunately for defendant, the contact was unreachable, and no plea agreement was reached.

Before trial, the court conducted a hearing on defendant's motion to suppress the testimony of the police regarding defendant's admissions pursuant to MRE 408 and MRE 410. At the hearing, defendant verified that he initially requested that Joe Hall arrange a plea bargain and that he

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] Defendant was subsequently arrested and charged with the crime in question.

contacted Lewis and James Hall. Defendant also admitted that the detectives refused to grant a guarantee of plea bargain, and that he interrupted his *Miranda* warnings by stating that he would not give any information without a guarantee. He conceded that the officers refused to grant him a guarantee and notified him that they had to receive the prosecutor's approval. Defendant also verified the remainder of the detective's testimony. The trial court found the statements to be admissible at trial.

Defendant was convicted as charged and the Court of Appeals affirmed his conviction. The Court found that although defendant's statements at the jail were improperly admitted under MRE 410, any error was harmless beyond a reasonable doubt. Unpublished opinion per curiam, issued April 14, 1992 (Docket No. 116674).

The majority, however, not only finds that the admission of the testimony was error, but finds its admission harmful and remands the case for a new trial.

II

Plea bargaining "is an essential component of the administration of justice." *Santobello v New York,* 404 US 257, 260; 92 S Ct 495; 30 L Ed 2d 427 (1971); *United States v Ykema,* 887 F2d 697, 699 (CA 6, 1989), cert den 493 US 1062 (1990). The United States Supreme Court has noted that properly administered, plea bargaining is to be encouraged because

[i]t leads to prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pretrial confinement for those who are denied release

pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned. [*Santobello, supra* at 261.]

To encourage plea agreements,[3] MRE 410, at the time of the trial in the instant case, mandated:

Except as otherwise provided in this rule, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer.[4]

I join the majority's adoption of the standard enunciated in *United States v Robertson,* 582 F2d 1356, 1366 (CA 5, 1978), and *People v Oliver,* 111 Mich App 734, 756; 314 NW2d 740 (1981),[5] to determine whether admissions occurred during plea discussions:

The trial court must apply a two-tiered analysis and determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second,

---

[3]   The purpose behind the exclusion of MRE 410 is that plea bargaining is to be encouraged to help achieve the effective administration of criminal justice and admissibility would discourage such bargaining. [*People v Oliver,* 111 Mich App 734, 756; 314 NW2d 740 (1981).]

[4] Currently, MRE 410 prohibits the introduction of such evidence only if the statements are made to government attorneys.

[5] See also *People v Conte,* 421 Mich 704, 744; 365 NW2d 648 (1984) (opinion of WILLIAMS, C.J.); *People v Manges,* 134 Mich App 49, 59-60; 350 NW2d 829 (1984).

whether the accused's expectation was reasonable given the totality of the objective circumstances.

The majority holds that, for the purposes of MRE 410, the admissions were part of an ongoing plea negotiation. The majority finds that defendant "had a subjective expectation to negotiate a plea at the time of the discussion, and that his expectation was reasonable given the totality of the objective circumstances." *Ante* at 415-416.

Yet, the consensus of courts considering the issue is that admissions in circumstances similar to the instant case are admissible evidence. In fact, courts have consistently held that statements made during requests to arrange plea agreements are admissible. See, e.g., *United States v Ceballos,* 706 F2d 1198, 1203 (CA 11, 1983) (holding that an incriminatory letter written in the hope of obtaining a plea bargain was admissible because "no plea negotiations were underway"); *United States v Sebetich,* 776 F2d 412, 422 (CA 3, 1985). Similarly, incriminatory statements are admissible if a defendant offers them after being forewarned by law enforcement officials that they lacked authority to complete a plea bargain. See, e.g., *Rachlin v United States,* 723 F2d 1373, 1376-1377 (CA 8, 1983); *Ceballos, supra* at 1203; *Sebetich, supra* at 422.

In *Sebetich,* for instance, the defendant made incriminating statements during a discussion with an FBI agent. The court admitted the statements, finding that because the defendant understood that the agent did not possess the authority to plea bargain and that no bargain would be struck during the discussion, any expectation of the defendant that he was in the course of plea negotiations was unreasonable. *Id.* at 421-422. In *United States v Keith,* 764 F2d 263 (CA 5, 1985), the

defendant made incriminating admissions to law enforcement agents in the spirit of cooperation and with the hope for leniency. As in the instant case, the agents informed the defendant of his *Miranda* rights, and told him that they could only "recommend" leniency and that the final plea bargaining authority rested with the United States Attorney. Utilizing *Robertson,* the court ruled that the statements were admissible because he did not " 'exhibit[ ] an actual subjective expectation to negotiate a plea at the time of the discussion' *and* the 'expectation was [not] reasonable, given the totality of objective circumstances.' " *Id.* at 266 (citation omitted).[6] In parallel fashion, the court in *United States v Posey,* 611 F2d 1389 (CA 5, 1980), found the defendant's statements admissible under *Robertson.* The defendant's statements occurred after he told a DEA agent that he would like to "cut a deal," the agent responded that he could only bring his cooperation to the attention of the prosecution, and the agent informed him of his *Miranda* rights. *Id.* at 1390-1391. See also *United States v Gentry,* 525 F Supp 17 (DC Tenn, 1980).

Hence, in the instant case, the majority's finding that defendant was engaged in plea negotiations when he admitted his criminal activity is simply untenable. The officers informed him of his *Miranda* rights and explained that they were incapable of guaranteeing a plea agreement because any agreement would have to be negotiated and approved by the prosecuting attorney. Not unlike *Sebetich, Posey,* and *Keith,* defendant's purported belief that he had entered bona fide plea negotiations or that the statements made to law enforcement officials would not be used against him was

---

[6] The court also ruled that FRE 410 was inapplicable because it only applied to government attorneys, not law enforcement officers. *Id.* at 265.

simply unreasonable. When defendant agreed to provide the information under these circumstances, he bore the risk that a plea agreement would not be reached. In fact, his gamble was nearly successful in that a tentative plea agreement was reached. The people should not be punished because defendant's risk-taking failed.

### III

Furthermore, a remand of this case is an empty gesture because recent amendments of MRE 410 permit the evidence at issue to be presented at trial. MRE 410 now bars statements made during plea negotiations only if the statements are made to attorneys. In the instant case, the officers in question were obviously not attorneys, and they disavowed any pretense of possessing the authority of a government attorney. The evidence at issue, therefore, is admissible on remand. *United States v Bernal,* 719 F2d 1475, 1478 (CA 9, 1983); *Rachlin, supra* at 1376.[7] Hence, the granting of a new trial is simply "an empty gesture." *People v Sanford,* 402 Mich 460, 498; 265 NW2d 1 (1978) (RYAN, J., concurring).

### IV

Finally, I agree with the majority that the trial

[7] Nor is the admission of such testimony unconstitutional under the United States or Michigan Constitution's prohibition of ex post facto laws. See, e.g., *Beazell v Ohio,* 269 US 167, 170-171; 46 S Ct 68; 70 L Ed 216 (1925) (noting that the admission of testimony by a particular witness at trial does not violate the prohibition against ex post facto laws even though the witness was precluded from testifying at the time of the crime); *People v Potts,* 436 Mich 295, 303; 461 NW2d 647 (1990) ("There is no violation of the ex post facto provision where the enactment at issue alters modes of procedure rather than substantial personal rights"); *Murphy v Sowders,* 801 F2d 205 (CA 6, 1986) (holding that admission of testimony at trial that was inadmissible at the time of the indictment and crime did not constitute an ex post facto law).

court's requirement that defendant wear leg shackles was harmless because the record fails to disclose that any member of the jury actually saw the shackles. Thus, the remainder of the majority's discussion regarding the propriety of requiring shackles is unnecessary obiter dicta, and more appropriately addressed pursuant to the Court's administrative power.

Thus, I respectfully dissent.

Boyle and Griffin, JJ., concurred with Riley, J.