# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
June 30, 2015

Plaintiff-Appellee,

v

No. 319347
Washtenaw Circuit Court
LC No. 12-001444-FC

LEONARD LAMONT WARE,

Defendant-Appellant.

Before: RONAYNE KRAUSE, P.J., and MURPHY and SERVITTO, JJ.

PER CURIAM.

Defendant was convicted by a jury of second-degree murder, MCL 750.317, carrying a concealed weapon (CCW), MCL 750.227, felon in possession of a firearm, MCL 750.224f, and possession of a firearm during commission of a felony (felony-firearm), MCL 750.227b. He was sentenced to 23 to 50 years' imprisonment for the murder conviction, 2 to 5 years' imprisonment for the CCW conviction, 2 to 5 years' imprisonment for the felon-in-possession conviction, and 2 years' imprisonment for the felony-firearm conviction. We affirm.

Defendant shot and killed a coworker not far from the manufacturing plant where they worked following a day of bickering and altercations between the two at the plant, including an incident in which the victim slapped defendant in the face, knocking off his safety glasses and dislodging his earplugs. The two ultimately agreed to engage in a fight after work, with the victim suggesting to defendant, through words and gestures, that defendant should bring his gun to the fight. Defendant and the victim walked away from the plant at the end of the workday and eventually squared up to fight in the middle of a nearby street. According to defendant, the victim, who purportedly was hot-headed and had bragged about being on parole for nearly killing a person, then turned "like he was reaching for something." Defendant, who had earlier retrieved a firearm from his truck, testified that he panicked, drew his gun, and began shooting because he was fearful that the victim was going to kill him. A witness testified to hearing gunshots and then observing the victim collapse, defendant standing over the victim, and defendant firing several more times into the victim's motionless body before running away. Defendant conceded that he did not see a weapon in the victim's hand. The county medical examiner testified that the victim sustained ten gunshot wounds, and the medical examiner described each of the wounds, which testimony was supplemented by the introduction of autopsy photographs. Defendant argued self-defense, and the trial court gave the jury extensive instructions on self-defense, directing the jurors that the prosecution had the burden to prove

-1-

beyond a reasonable doubt that defendant did not act in self-defense. With respect to a count of open murder, the jury was instructed on first-degree murder, MCL 750.316, second-degree murder, and voluntary manslaughter, MCL 750.321. The jury convicted defendant of second-degree murder, as well as the various weapons charges.

On appeal, defendant first argues that he was denied a fair trial when the trial court admitted numerous autopsy photographs described by defendant as gruesome, highly inflammatory, irrelevant, and unfairly prejudicial. The thrust of defendant's argument is that counsel, when objecting below to the admission of the photographs, expressly informed the trial court that defendant did not dispute, and was prepared to stipulate to, the number, location, and nature of the wounds, making the autopsy photographs entirely unnecessary to prove the prosecution's case, especially given the medical examiner's testimony.

We review for an abuse of discretion a trial court's evidentiary decision to admit photographs. *People v Gayheart*, 285 Mich App 202, 227; 776 NW2d 330 (2009). Photographic evidence is typically admissible when relevant, MRE 401, and not unduly prejudicial, MRE 403, and can be employed to corroborate a witness's testimony or to prove a defendant's state of mind. *Id.* "Photographs are not excludable simply because a witness can orally testify about the information contained in the photographs[,]" and "[g]ruesomeness alone need not cause exclusion." *People v Mills*, 450 Mich 61, 76; 537 NW2d 909 (1995). "[O]therwise admissible [photographs] . . . are not rendered inadmissible merely because they bring vividly to the jurors the details of a gruesome or shocking . . . crime, even though they may tend to arouse the passion or prejudice of the jurors." *Id.* at 77 (citations and quotation marks omitted).

Defendant's argument here was directly rejected by this Court in *People v Mesik (On Reconsideration)*, 285 Mich App 535, 544; 775 NW2d 857 (2009), wherein the panel ruled:

> Defendant argues that the photographs were not necessary because the manner of death was not disputed at trial and instead the main dispute involved the number and identity of the murderers. However, the prosecution is required to prove each element of a charged offense regardless of whether the defendant specifically disputes or offers to stipulate any of the elements. Therefore, while defendant did not contest [the] . . . cause of death, the prosecution was not relieved of its duty to prove all the elements of first-degree murder, including intent. The photographs were helpful to meet this burden. [Citation omitted.]

Moreover, defendant raised the disputed issue of self-defense, and the prosecutor was required to prove beyond a reasonable doubt that defendant did not act in self-defense. In *People v Howard*, 226 Mich App 528, 550-551; 575 NW2d 16 (1997), this Court concluded that the trial court did not abuse its discretion in admitting crime-scene and autopsy photographs in a double homicide "in light of the defense theory that defendant acted in self-defense[,]" which was a disputed issue in the case. Given the prosecution's burden of proof and defendant's claim of self-defense in the case at bar, we conclude that the trial court did not abuse its discretion in admitting the autopsy photographs. They were relevant, MRE 401, and their probative value was not substantially outweighed by the danger of unfair prejudice, MRE 403. The probative value of the photographs was that they served to undermine the claim of self-defense, as the photographs showed the great number of gunshot wounds, depicted wounds to the victim's

backside, side, and wrists, and revealed a bullet wound to the victim's cheek severing his carotid artery, which appeared to have resulted from defendant discharging his gun while standing directly over the victim. And as indicated by the authorities cited above, it was permissible to use the photographs to corroborate the medical examiner's testimony, the fact that the medical examiner orally testified to information that could be gleaned from the photographs did not bar their admission, any inherent gruesomeness attributed to the photographs did not require exclusion, and defendant's concession to the number, location, and nature of the gunshot wounds did not preclude introduction of the photographs. Reversal is unwarranted.

Defendant next argues that the trial court violated his constitutional due process right to a fundamentally fair trial when it improperly shackled him through the use of leg restraints during the trial without an individualized determination that shackling was necessary. Defendant also argues that defense counsel was ineffective for failing to strenuously object to the shackling. We review for an abuse of discretion a trial court's decision to shackle a defendant, taking into consideration the totality of the circumstances. *People v Payne*, 285 Mich App 181, 186; 744 NW2d 714 (2009). "Included within the right to a fair trial, absent extraordinary circumstances, is the right to be free of shackles or handcuffs in the courtroom." *Id.* In *People v Dunn*, 446 Mich 409, 425; 521 NW2d 255 (1994), our Supreme Court observed that "[t]he rule is well-established in this and other jurisdictions that a defendant may be shackled only on a finding supported by record evidence that this is necessary to prevent escape, injury to persons in the courtroom or to maintain order." "[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v Missouri*, 544 US 622, 629; 125 S Ct 2007; 161 L Ed 2d 953 (2005).[1]

Here, the trial court indicated that it needed to address the issue of shackles, but the court's discussion on the issue revolved entirely around making sure that the jurors did not see the shackles, not whether there was a need for shackles. The prosecutor made a fleeting remark to shackles being "a security issue," while at the same time stating that if it were up to the prosecutor, defendant "probably would not be in those." There was no finding by the trial court that shackling was necessary, let alone record evidence that supported the shackling of defendant.

Assuming an error by the trial court in having defendant shackled, reversal is unwarranted. Even when a court abuses its discretion by requiring a defendant to wear shackles or restraints, a defendant must still show prejudice in order to obtain a new trial, and a defendant is not prejudiced if the jury was unable to see the shackles. *Payne*, 285 Mich App at 186. The *Dunn* Court explained that because the record did not show that jurors saw or could see the leg

---

[1] As reflected in this quotation, the United States Supreme Court's decision in *Deck* discussed the need to justify the use of restraints in the context of *visible* restraints. We find it unnecessary to determine whether, as argued by the prosecution, the constitutional right not to be shackled or restrained absent a specified reason supported by the record applies only in the context of *visible* shackles or restraints.

irons worn by the defendant, the record did "not provide a basis for a finding that the use of leg irons deprived [the defendant] . . . of a fair trial." *Dunn*, 446 Mich at 425; see also *People v Horn*, 279 Mich App 31, 36; 755 NW2d 212 (2008) ("The jury never saw defendant in restraints in the courtroom and our caselaw holds that a defendant is not prejudiced if the jury was unable to see the shackles on the defendant.").[2] There is nothing in the record indicating that any jurors saw the shackles worn by defendant, and the shackles were removed, outside the presence of the jury, for purposes of defendant taking the stand to testify on his own behalf. Indeed, the trial court devoted a great deal of attention in regard to making sure that the jury did not observe the shackles. The record reflected that jurors could not see the leg restraints while defendant sat at the defense table. And as additional precautions, the trial court allowed everyone at the defense and prosecution tables, except for the lead attorneys, to remain seated during introductions, and allowed everyone, including the attorneys, to remain seated when the jury entered. Reversal is unwarranted.[3]

Next, defendant raises some issues in a Standard 4 brief, the first of which is that the trial court committed error requiring reversal when it sat a uniformed, fully-equipped police officer behind defendant at the defense table and behind defendant when he took the stand to testify. Defendant contends that his close proximity to the police officer identified defendant as a dangerous man, which undermined defendant's credibility and invited the jury to find him guilty on grounds other than the evidence presented at trial. Whether a defendant was afforded a fair trial is a question subject to de novo review. *People v Steele*, 283 Mich App 472, 478; 769 NW2d 256 (2009).

In *People v Rose*, 289 Mich App 499, 517-518; 808 NW2d 301 (2010), this Court discussed the due process right to a fair trial, stating:

> Every defendant has a due process right to a fair trial, which includes the right to be presumed innocent. Under the presumption of innocence, guilt must be determined solely on the basis of the evidence introduced at trial rather than on official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial. For that reason, courts must be alert to courtroom procedures or arrangements that might undermine the presumption of innocence. However, not every practice tending to single out the accused must be struck down. This is because the jurors are understood to be quite aware that the defendant appearing before them did not arrive there by choice or happenstance. Notwithstanding this, certain procedures are deemed to be so inherently prejudicial that they are generally not permitted at trial. . . . When determining whether a particular procedure is inherently prejudicial, courts

---

[2] The *Horn* panel further stated that even "when jurors inadvertently see a defendant in shackles, there still must be some showing that the defendant was prejudiced." *Horn*, 279 Mich App at 37.

[3] We also reject defendant's accompanying claim of ineffective assistance of counsel, given the inability to establish the requisite prejudice. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

examine whether there is an unacceptable risk that impermissible factors will come into play. . . . One important factor in determining whether a particular practice is inherently prejudicial is whether the practice gives rise primarily to prejudicial inferences or whether it is possible for the jury to make a wider range of inferences from the use of the procedure. . . . If a particular procedure is not inherently prejudicial, the defendant bears the burden of showing that the procedure actually prejudiced the trial. However, when the procedure is inherently prejudicial, it will not be upheld if the procedure was not necessary to further an essential state interest. [Citations, quotation marks, and ellipsis omitted.]

In *Holbrook v Flynn*, 475 US 560, 568-569; 106 S Ct 1340; 89 L Ed 2d 525 (1986), the United States Supreme Court held that the deployment of uniformed state troopers in the courtroom during trial was not an inherently prejudicial practice that required the establishment of an essential state interest. The Court observed:

The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. [*Id.* at 569.]

Under *Holbrook*, we cannot conclude that the presence of a police officer near defendant was inherently prejudicial, and defendant has failed to show that he was actually prejudiced by the deployment of the officer. Despite indisputably shooting the victim ten times, including in the back and side and while standing directly over the victim as he lay motionless, the jury nonetheless acquitted defendant of first-degree murder and convicted him of second-degree murder. Furthermore, the trial court instructed the jury that defendant was presumed innocent, and the court also instructed, "To repeat once more, you must decide the case based only on the evidence admitted during this trial." Defendant provides no argument suggesting that these instructions failed to remove the taint of any potential prejudice that might have arisen under the circumstances. See *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998) ("It is well established that jurors are presumed to follow their instructions."). Prejudice has not been established. *Assuming* that the deployment of the police officer was inherently prejudicial given his close proximity to defendant, especially while defendant testified on the stand, thereby suggesting particular official concern or alarm, there clearly existed an essential state interest in so deploying the officer, i.e., security for those in the courtroom, including the jurors. Defendant is 6'4" and 280 pounds with a felony record and was facing the potential of life imprisonment

after indisputably having shot a person ten times at close range, and he was not shackled while on the stand. In sum, reversal is unwarranted.

Finally, defendant argues that defense counsel was ineffective relative to the jury instructions and the verdict form associated with the open murder charge, which instructions and form were allegedly inconsistent with *People v Handley*, 415 Mich 356; 329 NW2d 710 (1982), and *People v Wade*, 283 Mich App 462; 771 NW2d 447 (2009).

Before setting forth the particulars of defendant's arguments and to understand the nature of those arguments, it is first necessary to review the jury instructions and the verdict form that was utilized below. The trial court instructed the jury on the elements of first-degree murder. After addressing the final element of first-degree murder, the trial court stated, "You may also consider the . . . lesser charge of second degree murder." The court proceeded to instruct the jury on the elements of second-degree murder, including the element requiring the prosecution to prove beyond a reasonable doubt "that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime."[4] The trial court then immediately instructed, "The crime of murder may be reduced to voluntary manslaughter if the defendant acted out of passion or anger brought about by adequate cause and before the defendant had a reasonable time to calm down." This instruction was perfectly consistent with M Crim JI 16.9(1) ("Voluntary Manslaughter as a Lesser Included Offense of Murder"). In strict compliance with M Crim JI 16.9(2) and (3), the trial court then instructed the jury on the components of voluntary manslaughter, such as emotional excitement.[5] The trial court did not instruct the jury on M Crim JI 3.11(6), which provides as follows:

> In this case, there are several different crimes that you may consider. When you discuss the case, you must consider the crime of *[name of principal charge]* first. [If you all agree that the defendant is guilty of that crime, you may stop your discussions and return your verdict.] If you believe that the defendant is not guilty of *[name principal charge]* or if you cannot agree about that crime, you should consider the less serious crime of *[name less serious charge]*. [You decide how long to spend on *(name principal charge)* before discussing *(name less serious charge)*. You can go back to *(name principal charge)* after discussing *(name less serious charge)* if you want to.]

Defendant complains, in part, about trial counsel's failure to request this instruction. In the verdict form, count 1 was identified as an open murder count and initially indicated that the jury was to choose between either acquitting defendant or finding him guilty of first-degree

---

[4] The court's instruction was verbatim from M Crim JI 16.5(4).

[5] The trial court also instructed the jury that if it had reasonable doubt whether defendant had the required state of mind, the jury was mandated to find "defendant not guilty of first degree or second degree murder or voluntary manslaughter." Also, the court instructed the jury that if a person acted in lawful self-defense, the person could not be found guilty of first-degree murder, second-degree murder, or voluntary manslaughter.

murder. It then directed the jury, if it found "defendant not guilty of first degree murder," to choose between either acquitting defendant or finding him guilty of second-degree murder. The verdict form next directed the jury, if it found "defendant not guilty of second degree murder," to choose between either acquitting defendant or finding him guilty of voluntary manslaughter. Defendant argues that this format was inconsistent with M Crim JI 3.11(6), in that the jury was forced to unanimously find defendant not guilty of first-degree murder before entertaining the offense of second-degree murder, and likewise forced the jury to unanimously find defendant not guilty of second-degree murder before entertaining the offense of voluntary manslaughter. Given defendant's conviction for second-degree murder, defendant focuses on the interplay between second-degree murder and voluntary manslaughter, contending that the jury should have been free to consider voluntary manslaughter without first having to come to a unanimous decision on second-degree murder.[6] Defendant asserts that counsel was ineffective for purportedly proposing the verdict form or for otherwise failing to challenge the use of the form.

M Crim JI 3.11(6), which was not read, is patterned on *Handley*, which addressed an argument that the trial court's instructions "had the improper effect of requiring the jury to unanimously find him not guilty of first-degree murder before it could proceed to the lesser charges" of second-degree murder and manslaughter; the defendant had been convicted of first-degree murder. *Handley*, 415 Mich at 357-358. The *Handley* Court, quoting a prior decision by the Supreme Court in *People v Hurst*, 396 Mich 1, 10; 238 NW2d 6 (1976), set forth the relevant ruling in *Hurst*:

> We agree . . . that this instruction improperly interfered with the jury's deliberations by requiring agreement of all twelve jurors to acquit the accused of the charged offense before considering a lesser offense.
>
> Under the judge's instruction, even if the jurors were 11 to 1 for acquittal and a significant number of jurors desired to discuss the possibility of convicting the defendant of a lesser offense, consideration of a lesser offense could not begin unless the one juror holding out for conviction were dissuaded from that view.
>
> The instruction is unrealistic and improper.
>
> Our disposition of this case does not require that we decide whether the giving of the instruction was reversible error. In the future, however, such instructions should be avoided. [*Handley*, 415 Mich at 358-359 (quotation marks omitted).]

The *Handley* Court proceeded to enunciate rules governing jury instructions in future cases when lesser offenses were at issue, stating:

---

[6] The jury had indicated that it was deadlocked at one point, but ultimately reached a verdict after being given the deadlocked-jury instruction, M Crim JI 3.12.

[A] jury instructed after the day this opinion is released must be told to consider the principal charge first. It should then be instructed that if it fails to convict or acquit *or is unable to agree* whether to convict or acquit on that offense, it may then turn to lesser offenses. The correct instruction would be that after the jury has given consideration to the greater offense, it may turn to lesser offenses *either* if it finds the defendant not guilty of the greater offense *or* if it is unable to agree on whether the defendant is guilty or not guilty of the greater offense. The judge may add that it is for the jury to decide how long to spend considering the greater offense before turning to a consideration of lesser offenses or, stated differently, it is for the jury to decide whether, having failed to reach an agreement on guilt or innocence on a greater offense, to spend more time in an attempt to reach unanimous agreement on the greater offense or whether the time has come to turn to lesser offenses. The judge may also add that of course the jury will not turn to lesser offenses if it finds the defendant guilty of the greater offense. [*Id.* at 361.[7]]

Here, as reflected above, when instructing on the offenses and elements of first-degree murder, second-degree murder, and voluntary manslaughter, the trial court fully complied with the standard instructions and said nothing that was inconsistent with M Crim JI 3.11(6) and *Handley*. The trial court should have instructed the jury on M Crim JI 3.11(6), given the lesser offenses, but this failure, in and of itself, does not warrant reversal. It is the failure to read M Crim JI 3.11(6) in conjunction with the problematic format of the verdict form, which raises real concerns of a *Handley* violation. The verdict form did suggest a need for all twelve jurors to acquit defendant of first-degree murder before the jury could move on to consider second-degree murder and for all twelve jurors to acquit defendant of second-degree murder before they could contemplate voluntary manslaughter.

Assuming deficient performance by counsel, we cannot conclude that defendant was prejudiced by counsel's presumed ineffectiveness. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). Defendant has not established "the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Id.* Defendant was acquitted of first-degree murder. Moreover, in the jury's examination of second-degree murder, it necessarily had to tackle the question whether the prosecution had proven beyond a reasonable doubt "that the killing was not justified, excused, or done under circumstances that reduce[d] it to a lesser crime." This examination would have encompassed contemplation of self-defense and of voluntary manslaughter principles such as emotional excitement and heat of passion, upon which the jury was instructed. And indeed the jurors presented the trial court with a request for a dictionary so that they could obtain a definition of the term "passion." Clearly, the jury was swayed that the prosecutor had established beyond a reasonable doubt that the shooting was not justified, excused, nor done under circumstances that would have reduced the

---

[7] The Court declined to reverse the defendant's conviction because defense counsel had expressed satisfaction with the jury instructions. *Handley*, 415 Mich at 360. Here, defendant frames the issue in the context of ineffective assistance of counsel.

crime to voluntary manslaughter. Additionally, defendant presented the defense of self-defense and did not argue in favor of heat of passion or extreme emotional excitement, which pertain to voluntary manslaughter. Accordingly, we simply cannot conclude that had the jury been read M Crim JI 3.11(6) and provided a verdict form consistent with *Handley*, the jury would have acquitted defendant of second-degree murder and settled on voluntary manslaughter or a complete acquittal.

Finally, with respect to the alleged *Wade* violation, the *Wade* panel addressed a case involving the primary offense of first-degree murder and the lesser offenses of second-degree murder and involuntary manslaughter, where the verdict form did not have a space or box to find the defendant generally "not guilty" relative to homicide and all three offenses as a whole, nor a particular space or box to find the defendant "not guilty" relative to each of the two individual lesser offenses. This Court held as follows:

> [W]e . . . conclude that the verdict form was defective, requiring reversal, because it did not give the jury the opportunity to return a general verdict of not guilty. *We note that the verdict form would not have been defective if it had included a box through which the jury could have found defendant not guilty of second-degree murder and not guilty of involuntary manslaughter.* Despite the trial court's efforts to clarify the verdict form with its instructions, because of the way the verdict form was set up, the jury was not given the opportunity to find defendant either generally not guilty or not guilty of the lesser-included offenses such that his constitutional right to a trial by jury was violated. Accordingly, we reverse defendant's conviction and remand this case for a new trial. [*Wade*, 283 Mich App at 468 (emphasis added).]

In the instant case, the verdict form did not violate *Wade* because it provided a "not guilty" option or box under each of the offenses, including the lesser offenses of second-degree murder and voluntary manslaughter. Thus, defendant's argument that counsel was ineffective under *Wade* in approving or failing to object to the verdict form finds no support in the record or in law.

Affirmed.

/s/ Amy Ronayne Krause
/s/ William B. Murphy
/s/ Deborah A. Servitto

-9-