PEOPLE v MANGES

Docket No. 70858. Submitted January 12, 1984, at Grand Rapids.—
   Decided April 17, 1984.

   Jayson L. Manges was convicted of one count of first-degree
      criminal sexual conduct and four counts of third-degree crimi-
      nal sexual conduct following a jury trial in Houghton Circuit
      Court, Stephen D. Condon, J. At trial, defendant moved to
      suppress statements which he had made to police officers and to
      the prosecutor in the county in which he was arrested. After
      defendant was arrested near to the site of the sexual assaults
      upon two girls as a result of being identified by one of the girls,
      he was given his *Miranda* warnings. Defendant was asked
      whether he understood his rights and whether he was willing
      to answer questions, to which defendant answered affirmatively
      in both instances. The police officer then indicated his concern
      for the other girl's safety and asked defendant when he had
      last seen the girl. Defendant indicated that he had seen the girl
      about an hour earlier at a location about 7 or 8 miles away.
      While defendant was being transported to the county jail, he
      was again given the *Miranda* warnings and he indicated he
      understood his rights and was willing to answer questions.
      Defendant answered several questions asked by the police;
      however, the police ceased questioning when defendant indi-
      cated that he wished to speak to Mr. Mather, the prosecutor for
      the county in which he was arrested. The prosecutor was called
      to the county jail and arrived about two hours after the giving
      of the *Miranda* warnings a second time. Defendant indicated a
      number of times to the prosecutor that he wished to make a

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 21A Am Jur 2d, Criminal Law §§ 938, 974.

   29 Am Jur 2d, Evidence §§ 529, 530, 555 *et seq.*

   30 Am Jur 2d, Evidence § 1138.

   What constitutes "custodial interrogation," within rule of Miranda
      v Arizona requiring that suspect be informed of his federal
      constitutional rights before custodial interrogation. 31 ALR3d
      565.

   Necessity of informing suspect of rights under privilege against self-
      incrimination, prior to police interrogation. 10 ALR3d 1054.

[3-5] 21 Am Jur 2d, Criminal Law § 481.

deal, to which the prosecutor responded that he could not make a deal because he did not know enough about the case. Defendant thereafter indicated that he had sexually assaulted the girls. The prosecutor at no point sought to readvise defendant of his rights or caution defendant that anything he said might be used against him. The trial court denied the motion to suppress, and testimony as to both the statements to police and the prosecutor was admitted into evidence at trial. Defendant appeals. *Held:*

1. Since defendant was fully advised of his rights, expressed a willingness to answer questions and had not asked to speak to counsel, the testimony concerning his statements as to the whereabouts of the girl was properly admitted even though it might be said that the question was asked under circumstances *of an emotionally charged nature.*

2. Defendant's request to speak to the county prosecutor cannot be said to be the equivalent of an invocation by defendant of his right to speak to counsel.

3. Since the defendant clearly evidenced a desire to negotiate a deal with the prosecutor, and since the prosecutor's statement that he could not make a deal because he did not know enough about the case raised a reasonable expectation on defendant's part that a deal might be struck if he gave the prosecutor more information, the statements by the defendant to the prosecutor were part of plea negotiations, and, accordingly, testimony concerning those statements were not admissible under the controlling section of the Michigan Rules of Evidence.

4. Defendant's remaining allegations of error are either not preserved or unlikely to reoccur on retrial.

Reversed and remanded.

1. Criminal Law — Confessions — Emotional Issues — *Miranda* Warnings.

Answers given by a criminal defendant during police interrogation are admissible at trial even if the questions asked of the defendant concern topics of an emotionally charged nature where prior to the questioning the defendant was given the *Miranda* warnings, the defendant stated that he understood his rights and was willing to answer questions, and the defendant had not indicated that he wished to speak to an attorney.

2. Criminal Law — Confessions — *Miranda* Warnings — Request for Counsel.

A request by a criminal defendant, during police interrogation

and after being given the *Miranda* warnings, to speak to the county prosecutor is not the equivalent of an invocation by the defendant of his right to speak to counsel.

3. CRIMINAL LAW — PLEA BARGAINS — CONFESSIONS — RULES OF EVIDENCE.

The Michigan Rules of Evidence make a statement made in connection with an offer to plead guilty inadmissible against the person making the offer, except in a criminal proceeding for perjury or false statement; the rule is based on the idea that plea negotiations should be encouraged and also on a sense of fairness (MRE 410).

4. CRIMINAL LAW — PLEA BARGAINS — CONFESSIONS — RULES OF EVIDENCE.

The question of whether a particular discussion between a criminal defendant and a prosecutor will be considered as a plea negotiation for the purpose of determining the admissibility of the defendant's statements under the Rules of Evidence depends on the totality of the circumstances; a trial court, when ruling on such question, should apply a two-tiered analysis to determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances (MRE 410).

5. CRIMINAL LAW — PLEA BARGAINS — CONFESSIONS — RULES OF EVIDENCE.

Statements made by a criminal defendant to a prosecutor after the defendant repeatedly asked if he could make a deal and the prosecutor indicated that he could not make a deal because he did not know enough about the case to make a deal should properly be considered to be part of a plea negotiation and, thus, were not admissible at trial, since the defendant, under these circumstances, expressed the expectation to negotiate a plea and the defendant reasonably treated the prosecutor's statement that he did not have enough information to make a deal as an invitation for defendant to talk about the case in furtherance of the defendant's expressed desire to negotiate a plea (MRE 410).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Richard S. Murray,*

Prosecuting Attorney, and *Michael A. Nickerson,* Assistant Attorney General, for the people.

State Appellate Defender (by *Terence R. Flanagan),* for defendant on appeal.

Before: MacKenzie, P.J., and Beasley and K. B. Glaser,* JJ.

Per Curiam. Defendant appeals as of right his jury conviction of one count of first-degree criminal sexual conduct, MCL 750.520b(1)(e); MSA 28.788(2)(1)(e), and four counts of third-degree criminal sexual conduct, MCL 750.520d(1)(a); MSA 28.788(4)(1)(a). The convictions arose out of a series of sexual assaults upon two 15-year-old girls occurring in the late evening of May 19, 1982, or the early morning of May 20, 1982.

One of the girls, Randee, after being dropped off by the defendant at a friend's house the morning of May 20, called the police. Officer Coffey took a statement from Randee concerning the sexual assaults which had occurred. Later, at approximately 4:00 p.m., another officer, Officer Sholander, and Randee drove to the area where the assaults had occurred in search of the other victim, Lenora, who had succeeded in running away from defendant's truck which had been parked in a wooded area. While crusing through the area, Randee spotted defendant's truck driving down the road, and Officer Sholander stopped defendant. Randee identified defendant as the assailant, and Officer Sholander arrested defendant and advised defendant of his *Miranda* rights. *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). Defendant was asked whether he understood his rights and whether he would be willing

* Circuit judge, sitting on the Court of Appeals by assignment.

to answer questions, and defendant responded in the affirmative to both inquiries. Officer Sholander conveyed to defendant his concern for Lenora's safety and asked defendant when he had last seen her; defendant responded that he saw her about an hour earlier at approximately 3:00 p.m. near Big Lake Road, about 7 or 8 miles away. Officer Sholander asked defendant no other questions.

Pursuant to Officer Sholander's call for assistance, Officers Coffey and Baker arrived on the scene and placed defendant in their patrol car, and Sholander left to search for Lenora. While en route to the county jail, Officer Coffey advised defendant for a second time of his *Miranda* rights, and defendant stated that he understood his rights and would be willing to answer questions. Officer Baker then asked defendant some questions, such as: when he picked up the girls, whether he knew the girls previously, and when and where he had last seen Lenora. Defendant answered these questions, but the officers ceased questioning defendant when defendant indicated that he wanted to talk to Mr. Mather. Officer Baker testified at the suppression hearing that defendant "indicated that maybe he'd better talk with an attorney, and he mentioned Mr. Mather's name". Officer Coffey testified that defendant "said he didn't want to ask any more—answer any more questions, he wanted to talk to Mr. Mather". Mr. Mather was the prosecutor in the county in which defendant was arrested. After arriving at the county jail, the officers contacted Mr. Mather and told him that defendant wanted to speak to him. Mather arrived at the county jail to speak to defendant about two hours after defendant had been given his *Miranda* warnings a second time.

Defendant asserts on appeal that the trial court

erred in ruling that defendant's statements to Officer Sholander and to Officers Baker and Coffey were admissible. Defendant argues that these statements should have been suppressed because, by expressing their concern for the missing girl, the officers unfairly played on defendant's emotions in eliciting the statements from defendant. In support of this contention, defendant relies on *Brewer v Williams,* 430 US 387; 97 S Ct 1232; 51 L Ed 2d 424 (1977). However, *Brewer* is distinguishable since there, prior to the police officers' "Christian burial" speech, the defendant had not indicated a willingness to be questioned in the absence of an attorney and had stated that he would tell the whole story after consulting with his attorney. In the instant case, prior to the police officers' questioning, defendant had been advised of his *Miranda* rights and stated that he understood his rights and was willing to answer questions. *Brewer* does not stand for the proposition that statements or questions which may arouse the emotions of the defendant require the suppression of the defendant's responses. We find no error; defendant's responses to the questions asked by the police officers were properly admitted at trial.

Defendant also argues that the court erred in denying defendant's motion to suppress his statements made to Mr. Mather. On direct examination at the suppression hearing, Mr. Mather testified in pertinent part as follows:

"*Q.* Do you recall being called to the Baraga County Sheriff's office on the evening of May 20th of this year?

"*A.* Very clearly.

"*Q.* Could you tell us basically what happened when you got there?

"*A.* When I got there, Lieutenant Baker, as I recall, and I think Trooper Coffey, was in the outside room

with Sarah Heikkinen and Sheriff Heikkinen and Jayson, whom I recalled from having talked to him in my office some years before.

"*Q*. Would that be the defendant in this case, Jayson Manges?

"*A*. Yes, I've known Jayson for sometime. And I think Willard Coffey repeated again that Jayson wanted to talk to me; he had called me on the phone and told me that Jayson wanted to talk but only to me. So I remember asking the sheriff, 'Where's a good place to talk?' He said, 'Go in that room.' And I went in and Jayson followed me in and I remember sitting down in a chair that was somewhat distant from the door to the office and that Jayson had a chair in between me and the office. There was no design or purpose, that just comes back in my mind's eye that that's how we were seated. And I have had the experience of being called by defendants from jail not infrequently and so I wasn't too surprised at this. And I said to Jayson, 'What do you want to talk about, Jayson? Do you want to talk to me?' He said, 'Yes.' And the entire conversation was marked by long pauses, I remember that very definitely. And I'm not sure but what he was quite slow in even replying to that. Whatever he said later, I recall very clearly that he said to me, 'Well,' he says, 'I remember you were very fair with me once or twice before and that's why I want to talk to you.' *I said, 'What do you want to talk about?' And he says, 'Well, I'd like to talk to you about making a deal.' And I told him that I thought I knew quite a bit about the case, but I was sure I didn't know all about it, but no matter what I knew, it was insufficient for me to consider making a deal with him. And I clearly recall that he said, 'Well, I could tell you a lot more about it than you know.' And I said, 'I'm sure you can.' And he repeated many times, and I'm sure right again, he said, 'Well, isn't there some way we can make a deal?' And I had to repeat an equal number of times that we couldn't make a deal because—the single reason I gave him is I just didn't know enough about the case to even discuss a deal.*

"*And then I remember telling him that if he wanted to talk about the case, that's what I was here for and so*

*go ahead and talk about the case.* As best I recall, there was a considerable pause after that exchange and he said, 'Well, I wouldn't have done it if I hadn't had so much brandy.' I clearly recall that. *And I guess again he brought up the deal because it came up at least eight, ten, twelve times, the topic of the deal. I gave him the same answer.*

"He said several times, 'I didn't mean to hurt them.' He said several times that he was worried about the other girl. He referred—he didn't use any name of a girl in talking to me, he kept saying the other girl.

"I listened very intently, interspersed with these pauses, and finally I asked him point-blank, I said, 'Jayson, did you sexually assault those girls?' Long pause. He said, 'Yes, but they really didn't resist very much.' And I said, 'Well, maybe if they didn't resist very much it's because they were very aware of the knife that was on the seat of the truck.' * * * *The deal —the topic of the deal came up again,* the topic of his being worried about the girl came up again, and I remember that each time he said somthing that I believed, I told him I believe it.

\* \* \*

"*Q. Did you yourself take any of the* Miranda *warning steps?*

"*A. None whatsoever.* I had been advised that he'd been—I remember that very explicitly; I remember asking Trooper Coffey over the phone if that had been the case, and he said yes and he repeated that he'll talk, but he only wants to talk to me."

In addition, Mr. Mather's testimony on cross-examination at the hearing included the following:

"*Q. Mr. Mather, you said—testified that you've known Jayson for quite sometime. Is that through your position as Baraga County Prosecutor?*

"*A. Exclusively.*

"*Q. Do you feel that Mr. Manges approached you because he—or wanted to talk to you because he knew you and trusted you?*

"*A. Yes.*

"*Q. And, in fact, Mr. Manges has been before the Baraga County court before. And has there been plea bargaining?*

"*A. Yes, there has.*

\*  \*  \*

"*Q.* And from the gist of your testimony, it appears that he—Mr. Manges was talking about a deal before ever talking about the incident, is that correct?

"*A.* Was talking about the deal—say that again.

"*Q.* He wanted to make a deal. Mr. Manges said, 'Let's make a deal,' and I'm shortening this up. \* \* \*

"*A.* Yes, of course.

"*Q.* 'Let's make a deal. I know more about—I can tell you more about this than you know.'

"*A.* Yes.

"*Q.* Okay. Did he make statements like that to you before he actually started talking about, 'I wouldn't have done it if I hadn't drank so much brandy'?

"*A.* Yes, he did.

"*Q.* So he was in fact talking abut making some sort of deal.

"*A.* Yes, and I—every time he mentioned the word, I reminded him that I was not in a position to make a deal.

"*Q. Did you ever tell him that you in fact are the Baraga County Prosecutor and that anything that he does tell you about the incident* \* \* \*?

"*A. No, I made no such statements as that.*

\*  \*  \*

"*Q.* Did it appear that Mr. Manges was in fact talking to you because he did want to make a deal, or he was attempting to convince you of a deal?

"*A.* Did it appear? I'd have to say that my perception, my experiencing of him, after I repeatedly told him that I wasn't in a position to make a deal, was that he was speaking to me cathartically. I experienced it that way. That's my answer to your question.

"*Q.* What do you mean by that?

"*A.* Well, that he was experiencing a relief, because

he interspersed much of what he said with how sorry he was, he didn't mean to hurt them, didn't want to hurt them, was worried about the girl. And I perceived him to be getting emotional benefit, satisfaction, out of saying these things. Because when he said things that I believed he believed, I told him I believed him and * * *.

"*Q.* Okay.

"*A.* So all I can report is only my perceptions. You've asked me a question of how it appeared.

"*Q. And this would be that he trusted you?*

"*A. I had that impression; yes, that was an impression.*" (Emphasis added.)

We do not agree with defendant's contention on appeal that defendant's request to speak with Mr. Mather was equivalent to an invocation of his *Miranda* right to counsel. See *Fare v Michael C,* 442 US 707; 99 S Ct 2560; 61 L Ed 2d 197 (1979) (request to speak to probation officer not an invocation of *Miranda* right to counsel). The facts as revealed at the suppression hearing clearly reflect defendant's awareness that Mather was a prosecutor; there was no indication that defendant perhaps erroneously believed, for example, that Mather was a defense attorney or public defender. We cannot conclude that defendant's request to speak to Mather, known to defendant to be the county prosecutor, constituted even an ambiguous indication of an interest in having his own counsel, in contrast to the factual settings in *People v Plyler,* 86 Mich App 272; 272 NW2d 623 (1978) (defendant stated she did not want to write anything until she talked to an attorney) and *People ex rel Wayne Prosecutor v Recorder's Court Judge,* 79 Mich App 495; 261 NW2d 63 (1977), *lv den* 402 Mich 879 (1978) (defendant asked police officer if he thought she should have an attorney).

However, we do agree with defendant that MRE 410 precluded admission at trial of Mather's testimony relating defendant's inculpatory statements to him. MRE 410 provides as follows:

"Except as otherwise provided in this rule, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer. However, evidence of a statement made in connection with, and relevant to, a plea of guilty, later withdrawn, a plea of nolo contendere, or an offer to plea guilty or nolo contendere to the crime charged or any other crime, is admissible in a criminal proceeding for perjury or false statement."

As the express language of this evidentiary rule makes clear, not only pleas or offers to plea are inadmissible, but also any statements made in connection therewith. The principle underlying MRE 410 is that plea negotiations should be encouraged and that, for plea bargaining to work effectively and fairly, a defendant must be free to negotiate without fearing that his statements may later be used against him at trial. *People v Jones,* 416 Mich 354; 331 NW2d 406 (1982) (opinions by KAVANAGH, J., and RYAN, J).

For purposes of determining whether a particular discussion constitutes a plea negotiation to which MRE 410 applies, this Court in *People v Oliver,* 111 Mich App 734, 756; 314 NW2d 740 (1981), *lv den* 411 Mich 863 (1981), explained that the focus is on the defendant's perceptions and adopted the following two-tiered analysis articulated in *United States v Robertson,* 582 F2d 1356, 1366 (CA 5, 1978):

" 'The trial court must apply a two-tiered analysis and determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances.' "

In *Oliver,* this Court found that both prongs of the test were satisfied, since the defendant had made statements indicating a desire to plea bargain and his subjective expectation to negotiate was reasonable since, although the police officer stated that he was incapable of such negotiation and that defendant was talking to the wrong person, the officer had also told defendant that "he always tries to 'help a guy that tells me the truth' ", and admitted that "he attempts to leave a defendant with the impression that he is a 'good guy' who can be talked to openly". *People v Oliver, supra,* p 757.

Applying this two-part test to the present case, there is no question but that defendant's subjective expectation in talking to Mather was to negotiate a plea. Mather testified that defendant repeatedly, from the time the discussion commenced throughout its course, asked if he could make a "deal" with Mather. We also conclude that defendant's expectation was reasonable. As in *Oliver,* the prosecutor here gave defendant conflicting signals. Although the prosecutor told defendant he was not in a position to discuss or make a deal with defendant, he also told defendant that he did not know enough about the case to make a deal and expressly invited defendant to talk about the case. Also, the prosecutor admitted that defendant appeared to be reposing his trust in him, yet the prosecutor failed to stymie defendant's trust by, for example, warning defendant of his *Miranda*

rights or otherwise conveying to defendant that any statements he made were not confidential and might later be used against him. We conclude that defendant's statements to Mather were protected by MRE 410, and the court's erroneous admission of Mather's testimony relating defendant's inculpatory statements requires reversal of defendant's convictions.

In view of our reversal, we need not address defendant's claim that a comment by a member of the venire during jury selection deprived him of a fair trial. We also need not address defendant's claim that the trial court erred in denying defendant's motion for substitution of counsel and defense counsel's simultaneous motion for withdrawal; however, to avoid any potential problem on retrial, we urge the court to appoint a different attorney to represent defendant at the new trial unless defendant now has no objection to representation by the same attorney. Finally, while the question of whether Officer Coffey's testimony relating Randee's statement to him constitutes inadmissible evidence might arise on retrial, we decline to address it in the context of this appeal. The issue was not preserved for appellate review since defense counsel not only failed to object to this testimony by Officer Coffey, but indeed made use of this testimony himself by pointing out discrepancies between Randee's statement to Officer Coffey and her testimony at trial. *People v Stull,* 127 Mich App 14, 21-22; 338 NW2d 403 (1983); *People v Horton,* 98 Mich App 62, 71; 296 NW2d 184 (1980).

Reversed and remanded for new trial.