STATE of Utah, Plaintiff and Appellee,

v.

Adam B. GALLI, Defendant
and Appellant.

Nos. 960018, 960122, 960123.

Supreme Court of Utah.

June 16, 1998.

Rehearing Denied Nov. 3, 1998.

Jan Graham, Att'y Gen., Laura Dupaix, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Lisa J. Remal, Linda M. Jones, Salt Lake City, for defendant.

HOWE, Chief Justice:

Defendant Adam B. Galli entered conditional pleas of guilty to charges of aggravated robbery in three separate cases before separate trial judges. All three cases have been consolidated for purposes of this appeal. On appeal, Galli contends that (1) the three trial courts erred in failing to suppress his confession to police; (2) Judge Pat B. Brian erred in ordering him to pay restitution to his family for amounts they forfeited when he jumped bail; and (3) Judges Glenn K. Iwasaki and Kenneth Rigtrup erred in ordering him to serve consecutive prison sentences. We consider each of these assignments of error below.

## BACKGROUND

In 1992, Galli committed a string of armed robberies in Salt Lake City with his brother, Aaron Galli, and two cousins, Nathan and Christopher Galli. On April 29, 1992, Galli and his two cousins, Nathan and Christopher,

robbed the King's English Bookstore. Galli and Christopher went inside the bookstore while Nathan waited outside for the purpose of running interference if Galli and Christopher were pursued by police. Galli pointed a gun[1] at the store clerk and took approximately $250 in cash from the two cash registers[2] at the store.

On May 5, 1992, Galli and Christopher, armed with handguns, robbed the Trolley Corners Theaters. While Galli and Christopher were inside the theater, Aaron and Nathan waited outside in a separate car to keep lookout. When a witness ran out of the theater after Galli and Christopher, Nathan pulled up and told the witness to call the police while he pursued the robbers and obtained their license plate number. Galli and his accomplices took over $900 in cash from the theaters.

On June 6, 1992, Galli, disguised in a black wig, entered the Tool Shed and pointed a gun at the store clerk, Sylvia Nordoff. He said, "This is a stickup, give me all of your money or I'll kill you." When Ms. Nordoff refused to hand over the money, Galli grabbed nearly $180 in cash from the till and ran out of the store. Ms. Nordoff chased after him and tackled him just outside the store. Her son, Michael Nordoff, helped her hold Galli down. However, Christopher was waiting just outside the store. He threatened Ms. Nordoff and her son with a weapon and told them to let Galli go. Galli and Christopher ran to their car and fled. When witnesses attempted to pursue the two men, Nathan drove up and told them to call the police while he chased the robbers. Nathan later returned to the scene and gave false information to the police.

In June and July of 1992, Galli was charged with all three armed robberies and warrants for his arrest were issued. On July 10, 1992, he was arrested in King County, Washington. While being held in the King County Jail in Seattle, he was advised of his *Miranda* rights by two detectives from the Salt Lake City Police Department. He voluntarily waived his rights and agreed to talk to the detectives. During questioning, he incriminated himself and confessed to all three robberies.

In each case below, Galli moved to suppress his statements to the police. He contended that during questioning, he reinvoked both his right to counsel and his right to remain silent and that his confession was therefore obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Utah law. The judges in all three cases denied his motion to suppress.

Prior to his trial dates, Galli was released from jail after his family posted a bond for his release. However, in November 1992, he absconded from the state. His family forfeited nearly $40,000 in cash and real estate as a result of his flight from justice.

In August 1995, Galli was recaptured in Minnesota by authorities. Upon his return to Utah, he entered conditional pleas of guilty to charges of aggravated robbery and was sentenced in all three cases.[3] Judge Brian sentenced him to an indeterminate term of five years to life in prison and ordered him to pay $40,000 in restitution to his family for the money they forfeited when he absconded. Judge Iwasaki sentenced him to an indeterminate term of five years to life in prison with his sentence to run consecutively to Judge Brian's sentence. Judge Rigtrup

---

1. Galli claimed that during each of the robberies, he was armed with only a facsimile of a gun. He told the police that he was armed with a pellet gun that looked like an automatic firearm. Under Utah Code Ann. § 76-6-302, a person commits aggravated robbery if he uses a dangerous weapon during the commission of a robbery. Utah Code Ann. § 76-1-601(5) defines a dangerous weapon as "(a) any item capable of causing death or serious bodily injury; or (b) a facsimile or representation of the item." Thus Galli committed aggravated robbery under Utah law even if he used a facsimile of a firearm.

2. Galli's fingerprint was found on one of the tills at the King's English Bookstore. Galli and Christopher were also picked out of a photo lineup by witnesses.

3. Galli's conditional guilty plea was entered pursuant to *State v. Sery*, 758 P.2d 935, 939 (Utah Ct.App.1988), where the Utah Court of Appeals held that a conditional plea reserving a suppression issue for appeal that is agreed to by the defendant and the prosecutor is permissible under Utah law. *See also* Utah R.Crim. P. 11(i).

also sentenced him to five years to life in prison with his sentence to run consecutively to the sentences imposed by Judge Brian and Judge Iwasaki.

We now turn to Galli's assignments of error.

## ANALYSIS

### I. THE CONFESSION

The first question presented is whether the trial courts erred in failing to suppress Galli's confession to all three aggravated robberies. He contends that he reinvoked his *Miranda* rights during questioning and that the detectives refused to scrupulously honor those rights and terminate further questioning. He argues that his assertion was unequivocal and unambiguous but that even if his invocations of his *Miranda* rights were equivocal, the detectives were required to limit further discussion to clarifying questions only.

 First, we must determine whether Galli at any time reinvoked his *Miranda* rights, equivocally or otherwise. After reviewing the taped recordings and transcripts of his confession, Judges Brian and Iwasaki found that he had not reinvoked either his right to counsel or right to remain silent during questioning. Judge Rigtrup did not rule on Galli's motion on the ground that Judge Brian's ruling precluded relitigation of the suppression issue under the doctrine of collateral estoppel. Judge Rigtrup incorporated Judge Brian's findings, conclusions, and order into his own order.

We review the trial courts' factual findings underlying the denial of a motion to suppress for clear error, while conclusions of law are reviewed for correctness. *State v. Troyer*, 910 P.2d 1182, 1186 (Utah 1995).

 Galli contends that although he initially waived his *Miranda* rights, he reinvoked his rights to counsel and to remain silent early on during the interrogation. His argument relies on the following emphasized portions of his confession transcript:

Q: ... Let's start with the King's English. Back on the 29th of April.

A: King's English. What do you want me to say.

Q: What happened.

A: You know....

Q: I know this is hard for you.

A: *I can't even talk right now.* (Whispered)

Q: (Oliver) That's Ok Adam. If you need a minute, that's fine.

Q: Do you want us to turn this off for a minute.

....

A: I ... look you guys I want to do everything I can Ok.

Q: Well let's do it.

A: But they ... *the FBI guys told me to absolutely not talk to anybody at all.*

Q: That's not true because I talked to the FBI today when we got here.

A: *He said talk to the prosecuting attorney.*

Q: That's not true. Don't lie to me. I talked to the FBI agent that arrested you. His name is Jeff Bicker.

A: The big blonde guy.

Q: Big blonde guy.

A: *He said not to ... the prosecuting attorney.*

Q: If you're going to sit here and lie to me, you're insulting my intelligence. I have not insulted yours. Please don't insult mine, because I talked to Jeff today and he told me he had feelings that you were going to cooperate and I did too when I walked in here, but you start telling me that the FBI told you not to talk to anybody I can't believe that.

Q: (Oliver) Adam, these cases happened in Salt Lake City. We're Salt Lake Police Officer's [sic]. FBI; these are not Federal cases. They don't have any....

Q: The only reason the FBI arrested you is because the FBI was looking for you as an Unlawful Flight to Avoid Prosecution. It's called UFAP.

Q: (Oliver) Because you left the state of Utah.

A: *He said I should talk to an attorney. He said not to talk to any cops.* I'm not trying to lie. I'm not. I don't have any-

thing to gain, I don't have anything. What else can I lose.

Q: You can lose a lot, but you can also gain a lot. You can gain your dignity, your self respect, your redemption, her dignity, her respect of you.

Q: (Oliver) It'll probably feel a lot better if you got it off your chest.

Q: The charges are there. They're already defined.

A: I don't know what to do. I don't know if I should. Look you guys, I've only seen the movies, okay. *I don't know. . . . I think you're supposed to talk to, like, the attorney, and not talk to any cops.* Ok.

Q: Well is that what you want to do. You've also seen the movies where the cop talks to the suspect and he confesses it. I'm not going to beat you. I'm not going to rubber hose you or anything else. You've seen movies both ways because that's the way they are, and that's the way life is. In your situation you're sitting here ... you're not a bad guy. You're sitting here crying because of things that have happened. Things are eating you alive inside. Get them out. Get them out on the table.

(Emphasis added.) Galli asserts that the foregoing transcript shows that he reinvoked his *Miranda* rights during questioning and that the trial courts erred in failing to suppress his confession. We disagree.

Most jurisdictions have held that a suspect's request to speak to a prosecuting attorney is not equivalent to an invocation of the right to counsel under *Miranda,* equivocal or otherwise. *See People v. Manges,* 134 Mich.App. 49, 350 N.W.2d 829, 832 (1984) (defendant's request to speak to an attorney he knew to be the prosecutor was not even an ambiguous invocation of the right to counsel); *Riley v. State,* 501 So.2d 551, 553 (Ala. Crim.App.1986) (request to speak to district attorney not an assertion of right to counsel); *United States v. Brown,* 27 M.J. 614, 617 (A.C.M.R.1988) (request to speak to attorney who was a prosecutor was not an ambiguous invocation of right to counsel); *Trice v. State,* 853 P.2d 203, 211 (Okla.Crim.App.1993) (request to speak to district attorney not a request for counsel); *cf. Fare v. Michael C.,*

442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (request to speak to probation officer is not an invocation of right to counsel). Likewise, we hold that a defendant's request to speak to a prosecutor does not constitute even an equivocal assertion of the right to counsel. Thus police are free to continue to question a suspect who has only requested to speak to a prosecuting attorney.

Galli incorrectly argues that the case of *Carter v. State,* 108 Idaho 788, 702 P.2d 826 (1985), stands for the proposition that a suspect's request to speak to a prosecutor is an ambiguous invocation of the right to counsel. To the contrary, the defendant in *Carter* made a clear request to consult with an attorney. He did not request to speak to the prosecutor. Apparently, the interrogating officer told him that the prosecutor could be his attorney. 702 P.2d at 831. When the defendant asked the prosecutor whether he could represent him, the prosecutor explained that he was the prosecutor and could not represent the defendant. *Id.* The court held that the defendant had, "at the very least, [made] an equivocal request for counsel." *Id.* at 832. Therefore, unlike this case, the defendant in *Carter* made a request for an attorney who could represent him, not for the prosecuting attorney.

Even if *Carter* could be construed to mean that a suspect's request to speak to a prosecutor is an assertion of the right to counsel, it is not binding authority on us. We believe that such a rule would " 'transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity.' " *Davis v. United States,* 512 U.S. 452, 460, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362, 372 (1994) (quoting *Michigan v. Mosely,* 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 320 (1975)). "[I]t would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present." *Davis,* 512 U.S. at 460, 114 S.Ct. at 2356. Thus we decline to adopt a rule that would require the police to limit or stop the questioning of a suspect who has merely requested to talk to the prosecutor.

In this case, Galli made clear references to the prosecuting attorney. He did not request to consult with or to be represented by an attorney. According to the record, he was twenty-four years old at the time of his confession and was of high intelligence. He presumably knew the difference between a prosecutor and a defense attorney. Moreover, his references to the prosecutor were made shortly after he had voluntarily and knowingly waived his right to counsel.

Although Galli also made less specific references to "an attorney" and "the attorney," these references were all part of the same discussion concerning the prosecutor. Within the context of the discussion, these statements are nothing more than further references to the prosecuting attorney. Therefore, we find that the trial courts were correct in concluding that Galli had not reinvoked his *Miranda* right to counsel.

■ Galli also contends that he reinvoked his right to remain silent. He points to his statements that he should not "talk to any cops." However, these statements were all made during the same colloquy concerning the prosecuting attorney. From the record, it is evident that Galli thought he should talk to the prosecutor, not to the police.

During questioning, Galli also stated, "I can't even talk right now." Like his other statements, this is clearly not an assertion of his right to remain silent. He made this statement while distraught and emotional. The only reasonable interpretation of this statement is that his emotions had temporarily overcome his ability to speak. Thus Galli neither clearly nor ambiguously asserted his right to remain silent during questioning.[4]

For the reasons stated above, we conclude that Galli did not reinvoke his *Miranda* rights to counsel or to remain silent during questioning. Therefore, his confession was not obtained in violation of *Miranda.*

■ In his brief, Galli also contends that article I, section 12 of the Utah State Constitution requires police to limit their questioning to clarifying questions once a suspect has equivocally reinvoked his right to remain silent or his right to counsel. He asserts that even though the United States Supreme Court has held that police are not required to clarify a suspect's ambiguous request for counsel, *Davis*, 512 U.S. at 461, 114 S.Ct. at 2356, Utah law affords broader protections than those required by *Miranda* law.[5] However, because we have already concluded that Galli neither equivocally nor ambiguously asserted his right to remain silent or his right to counsel during questioning, we hold that his statements were also admissible under Utah law.

■ Although we have concluded that Galli's confession is admissible under *Miranda*, we still must decide whether his con-

---

4. Even if we agreed with Galli's argument that he ambiguously asserted both his right to counsel and his right to remain silent during questioning, we believe that his confession would still be admissible. In the recent case of *State v. Leyva*, 951 P.2d 738 (Utah 1997), we explained that the requirement in *State v. Wood*, 868 P.2d 70 (Utah 1993), that an officer limit his questioning to clarifying a suspect's ambiguous or equivocal invocation of the right to counsel "must be limited to prewaiver scenarios." *Leyva*, 951 P.2d at 743. We also stated that " '[a]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.' " *Id.* at 742–43 (quoting *Davis*, 512 U.S. at 461, 114 S.Ct. at 2356). In other words, police do not need to limit their questioning to clarifying questions when a suspect who has previously waived his *Miranda* rights makes an ambiguous request for counsel. Furthermore, we see no reason why this same rule should be different for ambiguous assertions of the right to

remain silent. Therefore, because it is undisputed that Galli voluntarily waived his Miranda rights, the detectives were free to question him until and unless he unambiguously reinvoked either his right to counsel or his right to remain silent.

5. We note that a similar state constitutional argument was made in *Leyva*, 951 P.2d at 743. However, we explained, " '[T]his court has never specifically held that *Miranda*-type warnings are required under the Utah Constitution.' " *Id.* (quoting *State v. Mirquet*, 914 P.2d 1144, 1147 n. 2 (Utah 1996)). We concluded that when "determining the content and scope of *Miranda*-based protections, we ... look[ ] to the United States Constitution as interpreted by the United States Supreme Court rather than to the Constitution of Utah." *Id.* Likewise, we decline at this time to interpret our state constitution as requiring *Miranda*-type warnings.

fession was coerced and involuntary. He correctly points out that in determining whether a confession is coerced, we must "consider 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *State v. Strain*, 779 P.2d 221, 225 (Utah 1989) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973)). Moreover, "[e]vidence sufficient to support a finding that a confession is involuntary must reveal some physical or psychological force or manipulation that is designed to induce the accused to talk when he otherwise would not have done so." *State v. Hegelman*, 717 P.2d 1348, 1350 (Utah 1986) (citation omitted). In other words, the evidence must show that the coercive tactics of the police overcame the defendant's free will. *State v. Mabe*, 864 P.2d 890, 893 (Utah 1993) (stating that "there must be a causal relationship between the coercion and the subsequent confession"). With these principles in mind, we now address Galli's claim of coercion.

First, Galli contends that he was vulnerable, emotional, and unsure during the interrogation. He argues that the detectives impermissibly took advantage of his fragile disposition. Although the record shows that Galli's emotions fluctuated from chuckling to weeping, Judges Brian and Iwasaki determined that he did not lose complete control of his emotions at any time during questioning. Furthermore, the record does not demonstrate that the detectives ever took impermissible advantage of his emotions. Instead, they offered to turn off the tape recorder and suspend questioning for a minute to allow Galli to regain his composure. Galli even held Detective Dalling's hand throughout the interview. Therefore, although Galli was emotional at times during the interrogation, we conclude that the detectives did not take unfair advantage of his emotional state.

Second, Galli asserts that the detectives misrepresented that Christopher and Aaron had implicated him in the robberies. This argument ignores the fact that the detectives actually told Galli that *Nathan*, Christopher, and Aaron had implicated him in the robberies. While Christopher and Aaron apparent-ly had not implicated him, Nathan had done so. The detectives also had fingerprint evidence and witness identifications that implicated him in the robberies. While the detectives' half-truths regarding the strength of the evidence against Galli should not be condoned, we are not convinced that this was sufficient to overcome his free will and spirit. *See Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir.1994) (stating that "[a] defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is").

Finally, Galli argues that the police promised him more lenient treatment if he confessed and threatened him with more severe treatment if he did not. He asserts that Detective Dalling promised him lenient treatment when the detective told him that "[h]ow much time [you serve], is up to you." However, it seems to us that the detective was merely pointing out that full cooperation would be in Galli's best interests. *See Strain*, 779 P.2d at 225 (stating that mere "appeals to the defendant that full cooperation would be his best course of action" is not coercive (citations omitted)). In fact, the record shows that Detective Dalling actually assured Galli that he was not "going to walk away from this" and was "going to do some time." Thus we hold that there was no express promise that Galli's punishment would be reduced if he confessed.

Galli also contends that Detective Dalling's statements that he would not "beat" or "rubber hose" him into confessing and "that's the way the movies are" suggested the initiation of more abrasive tactics if Galli did not cooperate. However, our interpretation of this statement is that Detective Dalling was actually assuring Galli that he would not strong arm him into confessing as is sometimes portrayed in the movies. Galli is unable to point out any other incidents in the record where the detectives made further threats to coerce his confession. Without more evidence supporting Galli's contention, we are unable to conclude that his confession was coerced by the detectives' threats or use of force.

In sum, we are not convinced that the tactics used by the detectives were sufficient-

ly coercive to overcome Galli's free will and spirit. Therefore, we conclude that his confession was voluntary and not coerced.

█ Because we conclude that Galli's confession was neither obtained in violation of *Miranda* nor coerced, we do not reach his arguments that Judge Rigtrup erred in holding that collateral estoppel precluded him from relitigating the suppression issue. Judge Brian's ruling denying Galli's motion to suppress was correct. The facts did not sufficiently support his motion to suppress. Consequently, the error, if any, in Judge Rigtrup's invocation of collateral estoppel was harmless.

## II. ORDER OF RESTITUTION

█ We now consider whether Judge Brian erred in ordering Galli to pay restitution to his family for amounts they forfeited when he absconded from the jurisdiction after being released on bail. Particularly, Galli contends that Judge Brian incorrectly interpreted and applied Utah Code Ann. § 76–3–201 when he ordered him to pay restitution to his family. We review the trial court's interpretation of a statute for correctness and accord no deference to its conclusions of law. *State v. Brooks,* 908 P.2d 856, 859 (Utah 1995).

Judge Brian's order of restitution was made pursuant to section 76–3–201. Section 76–3–201(4)(a)(i) provides:

> When a person is convicted of criminal activity that has resulted in pecuniary damages, in addition to any other sentence it may impose, the court shall order that the defendant make restitution to *victims* of crime as provided in this subsection, or for conduct for which the defendant has agreed to make restitution as part of a plea agreement.

(Emphasis added.) Galli argues that his family cannot properly be considered victims under the foregoing provision. We agree.

Section 76–3–201(1)(e)(i) defines "victim" as "any person who[ ] the court determines has suffered pecuniary damages as a result of the defendant's criminal activities." Section 76–3–201(1)(b) defines "criminal activities" as "any offense of which the defendant

is convicted or any other criminal conduct for which the defendant admits responsibility to the sentencing court with or without an admission of committing the criminal conduct." Galli was neither charged nor convicted of bail jumping under Utah Code Ann. § 76–8–312 (1995). Thus, the only way that his family could be victims of bail jumping would be if Galli admitted responsibility for this crime to Judge Brian.

The State argues that Galli did admit responsibility for bail jumping to the court and points out that his attorney began her argument at the sentencing hearing by stating:

> Mr. Galli stands before you a person now convicted of a count of aggravated robbery, but also as a person who, because of his own actions, which were clearly something that was an error in judgment—*and I am referring to his leaving the jurisdiction and being absent for almost three years* . . . .

(Emphasis added.) The State relies on the foregoing statement and similar statements of defense counsel to argue that Galli did admit responsibility for bail jumping to the sentencing court.

█ However, we do not believe that the statements of defense counsel are relevant. The plain wording of section 76–3–201(1)(b) requires that the "*defendant* admit[ ] responsibility to the sentencing court," not to defense counsel. (Emphasis added.) Furthermore, admissions by defense counsel do not generally constitute an admission of criminal responsibility by the defendant. In *State v. Gibbons,* 740 P.2d 1309 (Utah 1987), we stated, "'It is too late in the day to permit a guilty plea to be entered against a defendant solely on the consent of the defendant's agent—his lawyer.'" *Id.* at 1313 (quoting *Henderson v. Morgan,* 426 U.S. 637, 650, 96 S.Ct. 2253, 2260, 49 L.Ed.2d 108, 117 (1976) (White, J., concurring)). Therefore, we conclude that defense counsel's statements at the sentencing hearing did not constitute an admission of responsibility for bail jumping by Galli.

Because Galli did not admit responsibility for bail jumping, bail jumping is not a criminal activity for which restitution was proper

under section 76–3–201(4)(a)(i). Moreover, members of Galli's family were not victims of any crime for which he was convicted or for which he admitted responsibility to the sentencing court. Thus, Judge Brian's order of restitution was erroneous.

## III. CONSECUTIVE SENTENCES

■ The final question presented by Galli's appeal is whether Judge Iwasaki and Judge Rigtrup abused their discretion in ordering him to serve consecutive sentences. Under Utah Code Ann. § 76–3–401(1), "[a] court shall determine, if a defendant has been adjudged guilty of more than one felony offense, whether to impose concurrent or consecutive sentences for the offenses." We have stated, "The statute ... favors concurrent sentences." *State v. Strunk,* 846 P.2d 1297, 1301 (Utah 1993) (citing § 76–3–401(1)). In determining whether to impose consecutive sentences, the court is required to "consider the gravity and circumstances of the offenses and the history, character, and rehabilitative needs of the defendant." Utah Code Ann. § 76–3–401(4). Applying the foregoing statutory factors to this case, we conclude that Judges Iwasaki and Rigtrup abused their discretion by ordering Galli to serve consecutive sentences for his crimes.

First, although the offenses Galli committed were very serious crimes—all first degree felonies—the record shows that Judges Iwasaki and Rigtrup may not have given adequate weight to certain mitigating circumstances. Galli did not inflict any physical injuries on his victims. While it is true that he used a gun during the robberies, he told police detectives that it was only a pellet gun and was incapable of inflicting serious injury. Moreover, the amount of money taken at the robberies was relatively small.

Second, Galli's criminal history likewise does not support the imposition of consecutive sentences. His prior criminal history consisted of minor traffic offenses and one misdemeanor theft conviction. While it is true that he absconded from the jurisdiction and was a fugitive from justice in Minnesota for three years, the State did not charge him with bail jumping. Thus it is difficult for us to see how this fact can provide more than nominal support for the imposition of consecutive sentences when the State did not seek to prosecute Galli for this offense.

Third, although Galli's offenses and flight from justice reflect negatively on his character, other facts in the record regarding his character do not support the imposition of consecutive sentences. He voluntarily confessed and admitted responsibility for the crimes he committed. The record suggests that he has expressed a commitment and hope to improve himself. In addition, while in Minnesota, he apparently obeyed the law, helped his neighbors, and was a productive individual.

Finally, the record also suggests that consecutive sentences are not in accord with Galli's rehabilitative needs. As stated above, his conduct while in Minnesota shows that he has the ability to improve himself and become a productive, law-abiding citizen once he has paid his debt to society. The imposition of concurrent rather than consecutive sentences better serves Galli's rehabilitative needs by allowing the Board of Pardons and Parole to release him from prison after five years if he has shown genuine progress toward rehabilitation. If he does not show such progress, then the Board will be able to keep him incarcerated for a long time, including life.

On the basis of the foregoing, we conclude that Judges Iwasaki and Rigtrup abused their discretion by ordering Galli to serve consecutive prison sentences. Because of this conclusion, we do not reach Galli's further argument that Judge Rigtrup's sentencing order was erroneous because it was based on the suspicion that Galli may have committed a murder on another occasion of which he was not charged or convicted.

## CONCLUSION

For the reasons stated above, the trial courts did not err in denying Galli's motions to suppress his confession to police. However, we conclude that Judge Brian's order requiring Galli to pay $40,000 in restitution to his family for money they forfeited when he skipped bail was erroneous. We also hold that Judges Rigtrup and Iwasaki abused

their discretion by ordering him to serve consecutive prison sentences. The three convictions are affirmed, and the cases are remanded to the trial courts to resentence Galli in accordance with this opinion.

STEWART, Justice, concurring:

Although I agree that defendant's *Miranda* rights were not violated by the police interrogation in this case, I do not believe that the police interrogation was altogether benign. In my view, the interrogation was manipulative from a psychological point of view, with the two officers who conducted the interrogation playing almost classic "good cop," "bad cop" roles. I think it important to point out that psychological manipulation can be found to be coercive under the rules developed in *Miranda* jurisprudence and to emphasize that courts should not be misled by subtle and highly sophisticated police tactics that skirt the boundaries of improper official conduct. I do not, however, believe that the interrogation in this case transcended the boundaries that *Miranda* places on coercive police interrogations.

DURHAM, Associate C.J., concurs in the concurring opinion of Justice STEWART.

RUSSON, Justice, concurring in parts I and II and dissenting in part III:

While I concur with the majority opinion as to parts I and II, I respectfully dissent as to part III, which holds that Judges Rigtrup and Iwasaki abused their discretion in sentencing Galli to serve consecutive sentences. In my opinion, they did not abuse their discretion as the majority claims but acted well within their statutory right and consistently with our prior case law in ordering consecutive sentences.

The general rule we have wisely and consistently followed is that we will not disturb a sentence "unless it exceeds that prescribed by law or unless the trial court has abused its discretion." *State v. Shelby*, 728 P.2d 987, 988 (Utah 1986). A trial court abuses its discretion when it " 'fails to consider all legal-

ly relevant factors' or if the sentence imposed is 'clearly excessive.' " *State v. McCovey*, 803 P.2d 1234, 1235 (Utah 1990) (citations omitted). Moreover, we have recognized that "the exercise of discretion in sentencing necessarily reflects the personal judgment of the court and the appellate court can properly find abuse only if it can be said that no reasonable [person] would take the view adopted by the trial court." *State v. Gerrard*, 584 P.2d 885, 887 (Utah 1978) (citation omitted).

The majority does not assert that the consecutive sentences were clearly excessive. Indeed, it acknowledges that the string of armed robberies Galli committed were "very serious crimes." Nor does the majority contend that the trial judges failed to consider all legally relevant factors when they sentenced Galli.[1] Instead, it tenuously asserts that the judges "may not have given adequate weight to certain mitigating circumstances." However, in doing so, the majority has selected those factors which *the majority* deems relevant in sentencing and has simply imposed its own judgment without granting any deference to the trial judges, who are much more familiar with this case and with this defendant, and who are in a much better position than this court to impose sentences.

Nevertheless, assuming arguendo that the judges failed to properly weigh certain factors, the "mitigating circumstances" which the majority relies upon are hardly mitigating at all. With respect to the gravity and circumstances of the offenses, the majority offers three mitigating circumstances: (1) Galli did not inflict any physical injuries on his victims; (2) the pellet gun which he used during the robberies was incapable of inflicting serious injury; and (3) the amount of money taken was relatively small. In addition to being incorrect, these observations are wholly irrelevant.

For example, under section 76–6–302, a person commits aggravated robbery if he "(a) uses or threatens to use a dangerous weapon

---

1. The legally relevant factors are outlined in section 76–3–401, which provides that in determining whether to impose consecutive sentences, the judge must consider "the gravity and circum-

stances of the offenses and the history, character, and rehabilitative needs of the defendant." Utah Code Ann. § 76–3–401(4) (Supp.1997).

as defined in Section 76–1–601; (b) causes serious bodily injury upon another; *or* (c) takes an operable motor vehicle." Utah Code Ann. § 76–6–302(1) (emphasis added). To say that because Galli did not inflict physical injury upon his victims, he should be treated with leniency is tantamount to saying that his punishment should be mitigated by the fact that he refrained from taking an operable motor vehicle. Causing serious bodily injury is simply one means by which an individual may be guilty of aggravated robbery; its absence does not constitute a mitigating circumstance.

The majority also misapprehends the nature of a pellet gun. Common sense indicates that a pellet gun, while not as dangerous as a .357 magnum, can certainly cause death or serious injury if it strikes its victim in certain vulnerable parts of the body. Nevertheless, even if Galli had used a facsimile or representation of a dangerous weapon, he still would have committed aggravated robbery so long as the victims reasonably believed the facsimile was likely to cause death or serious bodily injury. *See id.* § 76–1–601(5). Therefore, the majority's conclusion that an offender's use of a pellet gun may be a mitigating factor in sentencing directly contravenes the purpose of the aggravated robbery statute, which is to impose a harsher punishment [2] when the offender uses *either* a dangerous weapon *or* a facsimile or representation of such a weapon which creates in the victim an apprehension that the device would cause death or serious injury.

Lastly, the majority's observation that Galli stole only a relatively small amount of money makes a travesty of justice. Will we call the next robber who leaves half the money in the till a charitable thief and treat him with more leniency than the one who emptied it?

As to the majority's consideration of Galli's criminal history, the majority states that he had only a minor traffic offense and a misdemeanor theft conviction. Moreover, the majority gives weight to the fact that the State did not charge him with bail jumping when he absconded to Minnesota. However, the majority ignores the fact that when Judge Iwasaki imposed the first consecutive sentence, Galli's criminal history included an aggravated robbery conviction. Furthermore, when Judge Rigtrup imposed the second consecutive sentence, Galli's criminal history included two aggravated robbery convictions. Also, the fact that the State elected not to charge Galli with bail jumping cannot be considered a mitigating factor. Indeed, it would be nearly impossible to count the times when the State could have charged an individual with several crimes as opposed to just one but chose not to for one reason or another. However, this does not, in any way, preclude the sentencing judge from considering the defendant's actions to be aggravating circumstances deserving a harsher sentence.

With respect to the majority's consideration of Galli's character, the majority gives weight to the fact that while Galli was in Minnesota, "he apparently obeyed the law, helped his neighbors, and was a productive individual." It almost goes without saying that a fugitive from justice will be on his best behavior so as not to be noticed by the authorities. Also, the majority's references to Galli's helping his neighbors and being a "productive individual" are so vague that they lack any substantive merit. The majority further gives weight to the fact that Galli expressed a commitment and hope to improve himself. While Galli should be commended for his intentions of becoming a better person, most judges would agree that a defendant tends to express remorse and intentions of conversion right about the time the judge is considering the defendant's sentence. Nevertheless, even if a defendant's desire to reform should be given weight during sentencing, the sentencing judge—not this court—is best equipped to evaluate the defendant's credibility and sincerity in this regard.

Finally, the majority suggests that concurrent rather than consecutive sentences better serve Galli's rehabilitative needs by allowing

---

**2.** Robbery is a second degree felony, whereas aggravated robbery is a first degree felony. *See* Utah Code Ann. §§ 76–6–301 & –302.

the Board of Pardons and Parole to release him after five years if he has shown "genuine progress toward rehabilitation." In doing so, the majority recognizes the Board's discretion to release prisoners before their sentences have run but ignores the trial courts' discretion to set minimum sentences. Nevertheless, those courts play an important role in sentencing criminal offenders, and I am unwilling to take away what the legislature has given to them.

The majority's opinion in part III sends a message to would-be criminals that they will receive no harsher punishment for committing two, three, or even twenty crimes than if they committed only one, so long as after they have completed their crime spree they become law-abiding individuals who help their neighbors and who desire to reform. Contrary to such reasoning, the legislature undoubtedly gave sentencing judges discretion, in part, to impose consecutive sentences for the very purpose of deterring criminals from engaging in repetitive criminal behavior.

Without any evidence that the judges in this case abused their discretion, I would affirm the consecutive sentences. At a minimum, the majority should remand this case to the trial judges to consider those "mitigating circumstances" which the majority asserts they failed to weigh. Only then can this court engage in meaningful appellate review to determine whether the judges in fact abused their discretion.

ZIMMERMAN, Justice, concurring and dissenting:

I concur in Justice Stewart's opinion. Although I, too, agree that the police interrogation did not violate defendant's *Miranda* rights, I believe the majority opinion should make the legal basis of this conclusion more clear for the benefit of the bench and bar. The majority does not connect its holding today to *State v. Leyva*, 951 P.2d 738 (Utah 1997), the binding Utah law. The majority mentions *Leyva* only in an easily overlooked footnote. *See* majority op. n. 6. As that footnote indicates, in *Leyva*, we decided that a defendant can reinvoke his *Miranda* rights after waiving them only by making an unequivocal statement of reinvocation. *See*

*Leyva*, 951 P.2d at 743. Under *Leyva*, the only relevant inquiry is whether the statement was unequivocal; anything less than an unequivocal statement will not suffice. Thus, in the present case, we need only determine whether a request to speak with a prosecutor is such an unequivocal reinvocation.

I emphasize that the majority's holding does not change the rule articulated in *Leyva;* it merely determines one kind of request that is not an unequivocal statement of reinvocation. I agree that it was not, and that disposes of defendant's claim here.

I also join in Justice Russon's opinion to the extent that it dissents from part III of Chief Justice Howe's opinion, which holds that the trial judges abused their discretion in sentencing Galli to serve consecutive sentences. I agree with Justice Russon that the trial judges have the statutory discretion to impose consecutive sentences. This discretion is broad, as it should be. Unlike the trial court, we have only a cold record before us. And also unlike the trial court, we have relatively little experience with the sentencing functions. The only situations in the past where we have found trial judges to have abused their discretion were instances in which the consecutive sentences were grossly disproportional. *See State v. Smith*, 909 P.2d 236, 244–45 (Utah 1995); *State v. Strunk*, 846 P.2d 1297, 1301–02 (Utah 1993). We should adhere to that standard. This case does not begin to meet the standards we have previously set for an abuse of discretion. An examination of the majority's reasoning shows that it has simply substituted its judgment for the trial judges'; it has given their decisions no deference.

In substance, this court is simply redeciding the consecutive sentence question on what amounts to a correctness basis. We should remember that we are only an appellate court, not trial judges. We each have distinctive jobs. We should remain within our own preserve and not poach on a trial judge's territory no matter how appealing non-record facts may make that poaching in a particular instance.